UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION CIII OF the INDEPENDENT ADMINISTRATOR.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

Feb. 9, 1993.

Charles M. Carberry, Investigations Officer of Intern. Broth. of Teamsters, New York City (Celia A. Zahner, of counsel).

Roger S. Hayes, U.S. Atty. S.D.N.Y., New York City (Steven C. Bennett, Asst. U.S. Atty., of counsel), for U.S.

Carmell Charone Widmer Mathews & Moss, Chicago, IL (Sherman Carmell, of counsel), for Daniel Ligurotis.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent

Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer, who supervised the electoral process that culminated in the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and disciplinary provisions.

Application CIII presents for this Court's review the decision of the Independent Administrator regarding disciplinary charges brought by the Investigations Officer against Daniel C. Ligurotis ("respondent"), the Secretary–Treasurer of IBT Local Union 705, which is located in Chicago, Illinois. The Independent Administrator found that Mr. Ligurotis brought reproach upon the IBT by obtaining an interest-free loan from Local 705, embezzling and unlawfully converting Local 705 funds, and engaging in a pattern of conduct that allowed corruption and unlawful activity to flourish in the Local. For these violations of the IBT Constitution, the Independent Administrator permanently barred Mr. Ligurotis from the IBT and prohibited him from receiving compensation from any IBT-affiliated entity. In order to offset the funds Mr. Ligurotis unlawfully converted, the Independent Administrator also prohibited IBT-affiliated entities from paying respondent his severance. Furthermore, the Independent Administrator precluded IBT-affiliated entities from making contributions on respondent's behalf to employment benefit plans, although the Independent Administrator did not alienate his vested benefits. Finally, the Independent Administrator prohibited any IBT-affiliated entity from paying Mr. Ligurotis' legal expenses. The Independent Administrator stayed imposition of his penalty pending this Court's decision.

Mr. Ligurotis argues that the Independent Administrator should have disqualified himself from this matter because of his role as Independent Counsel in connection with the Banca Nazionale del Lavoro ("BNL") matter. Respondent also argues that the decision of the Independent Administrator is not supported by substantial evidence and, as a result, is arbitrary and capricious. This Court finds that respondent's arguments are without merit and that the decision of the Independent Administrator is fully supported by the evidence. Accordingly, for the reasons stated below, the decision of the Independent Administrator is affirmed.

## I. BACKGROUND

The Investigations Officer charged that Mr. Ligurotis' conduct brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 6(b)(1), (2), (3), and (5) of the IBT Constitution.[1] Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 6(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Four such charges are: (1) violating the IBT Constitution, a Local Union By-law or other Union rule; (2) violating the IBT membership oath; (3) embezzling or converting union funds or property; and (4) disrupting or interfering with the performance of any of the Union's legal or contractual obligations. *See* Article XIX, §§ 6(b)(1)–(3), (5).

Pursuant to Section F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After conducting a

---

1. These Sections refer to the 1986 IBT Constitution, which was in effect when Mr. Ligurotis committed the charged conduct. The cited sections appear in the 1991 IBT Constitution under Article XIX, Section 7(b), in substantially the same language, and any changes between the 1986 and 1991 versions of the IBT Constitution do not affect the disposition of this matter. The Investigations Officer's charge, as well as the decision of the Independent Administrator, refer to the Sections appearing in the 1986 IBT Constitution. For consistency, then, this Court will also cite to the 1986 IBT Constitution.

hearing (the "hearing"), where Mr. Ligurotis was represented by counsel, and receiving a post-hearing brief, the Independent Administrator issued a 34–page decision. The Independent Administrator found that the Investigations Officer satisfied his burden of proving that respondent brought reproach upon the Union by receiving an interest-free loan from Local 705, embezzling the Local's funds, and fostering an atmosphere of lawlessness within the Local. (Decision of the Independent Administrator ("Ind. Admin. Dec.") at 14, 20, 29–30).

### A. Mr. Ligurotis' Financial Dealings with Local 705

Four sets of financial transactions involving Mr. Ligurotis and Local 705 are relevant to this Application. The first involves Mr. Ligurotis' compensation as administrator of Local 705's Pension Fund and its Health and Welfare Fund (the "Funds"). Specifically, the Independent Administrator found that for the period between October 1986 and October 1987, Mr. Ligurotis received $120,000 for serving as administrator of the funds. This compensation became an area of focus in an investigation by various Government agencies into administration of the Funds. On March 13, 1987, and again on May 18 and May 26, 1987, the United States Department of Labor ("DOL") interviewed the Funds' attorney, Mr. Sherman Carmell.[2] Part of this interview focused on respondent's compensation as administrator of the Funds. On May 27, 1987, DOL questioned Mr. Andrew Schumi, the pension plan's accountant, about respondent's salary as administrator. As a result of this investigation, in October 1988, the Secretary of DOL filed a complaint in the United States District Court for the Northern District of Illinois against respondent and other Funds' trustees seeking restitution of assets transferred to Mr. Ligurotis.[3] On October 18, 1988, the Illinois court entered a consent order (the "Agreement") which provided that on or before April 20, 1989, "the [Funds'] trustees shall pay, or cause[ ] to be

paid, the sum of $80,000 to the Pension Fund and the sum of 40,000 to the Welfare Fund."

A second financial transaction involving Mr. Ligurotis occurred in mid-February 1988. The Independent Administrator found that on February 16, 1988, Mr. Ligurotis granted himself a $77,000 salary increase for his service as Secretary–Treasurer without Executive Board approval. Mr. Ligurotis made this increase retroactive to October 1, 1987, and it caused his annual salary to rise to $225,000. The Independent Administrator noted that the minutes of the February 26, 1988 Board meeting contain no mention of respondent's pay raise. Although the minutes of a Local 705 Executive Board meeting on April 20, 1989—over one year later—assert that the Executive Board did approve the February 1988 pay raise, the Independent Administrator did not credit this evidence. He declined to find that the Executive Board granted contemporaneous approval of the pay raise.

A third financial transaction involved Mr. Ligurotis' decision, in August 1988, to repay the $120,000 to the Funds. The Independent Administrator found that to effectuate this repayment, respondent instructed Mr. Schumi to reduce his gross monthly pay as Secretary–Treasurer by $8,750 per month. These salary reductions were to be credited by the Local to the Funds in repayment of the $120,000 improper compensation. These reductions continued until December 1988, when without explanation Mr. Ligurotis began to receive his full salary. In December 1988, the reductions amounted to $43,750. In May 1989, salary reductions once again commenced. In January 1990, the reductions reached a total of $120,000.

Finally, a fourth financial transaction between respondent and Local 705 occurred on April 6, 1989. With salary reductions having ceased in December 1988, the Independent Administrator found that Mr. Ligurotis, acting without Executive Board approval, authorized and signed two Local 705 checks, which

---

2. The Office of Pension and Welfare Benefit Programs also participated in the March 13, 1987 interview.

3. DOL asserted that Mr. Ligurotis' receipt of the $120,000 as Funds' administrator, while also a full-time, fully compensated officer of Local 705, violated the Employee Retirement Income Securities Act.

totalled $120,000 and were payable to the Funds. In connection with this payment, Mr. Schumi wrote a letter, which ultimately went to DOL along with the cancelled checks, stating that "Local Union 705 has authorized the payment of $80,000 to Local 705 Pension Fund and $40,000 to Local 705 Health and Welfare Fund. The source of these monies was salary authorized but not taken by Daniel C. Ligurotis as Secretary Treasurer of the Union." The Independent Administrator, however, found two inaccuracies in this letter, which Mr. Schumi could not explain: the Executive Board did not authorize the payment and only $43,750 of the monies derived from Mr. Ligurotis' salary reductions.

The Independent Administrator concluded that by having Local 705 issue checks to the Funds when respondent's "salary reductions" amounted to only $43,750, the Local effectively loaned respondent at least $76,250. The Independent Administrator further found that the Executive Board of Local 705 did not authorize this loan at the time it was made, in violation of the Local's Bylaws and Section 503 of the Labor Management Reporting Disclosure Act ("LMRDA"), 29 U.S.C. § 401 et seq., which prohibits loans to union officers of over $2,000. 29 U.S.C. § 503. The Independent Administrator also found that respondent engaged in another improper financial transaction: By granting himself a $77,000 retroactive salary increase, the Independent Administrator reasoned that Mr. Ligurotis embezzled Local 705 funds in violation of Section 501(c) of the LMRDA. The Independent Administrator also concluded, after considering all surrounding circumstances, that respondent acted with the fraudulent intent necessary to sustain an embezzlement charge.

### B. Pattern of Conduct that Fostered Corruption

As to Charge Two, the Independent Administrator found that respondent engaged in a pattern of conduct that brought reproach upon the Union. Mr. Ligurotis' conduct, as relevant to this Charge, involves three distinct actions. First, the Independent Administrator found that respondent rewarded criminal activity by hiring as Local 705 employees three individuals, Mr. Richard Bravieri, Mr. Richard Green and Mr. Edward Fickett, although respondent knew that they were convicted criminals and despite the fact that the hiring of Mr. Fickett was in violation of federal labor law. Second, the Independent Administrator concluded that Mr. Ligurotis regularly carried a loaded handgun on Local 705 premises, even though respondent was aware that such conduct transgressed Local 705 policy. Finally, the Independent Administrator noted that Mr. Ligurotis intentionally violated the Consent Decree. As discussed in a 1990 decision, this Court found Mr. Ligurotis in contempt of the Consent Decree due to his becoming a named plaintiff in a lawsuit filed in Chicago that was intended to interfere with the work of the Court–Appointed Officers. See December 12, 1989 Memorandum & Order, 726 F.Supp. 943 (S.D.N.Y.1989). The United States Court of Appeals for the Second Circuit affirmed this decision in relevant part. See United States v. IBT, 899 F.2d 143 (2d Cir.1990).

## II. DISCUSSION

Mr. Ligurotis argues that the Independent Administrator—Judge Frederick B. Lacey— should have disqualified himself from hearing this matter due to his now-completed service as Independent Counsel in the BNL matter. In addition, respondent contends that the Independent Administrator's decision is arbitrary and capricious. For the reasons stated below, these arguments are without merit.

### A. Disqualification of the Independent Administrator

Mr. Ligurotis argues that the disqualification of Judge Lacey is governed by Title 28, United States Code, Section 455, and that he must be disqualified under this Section. Respondent also avers that Judge Lacey should be disqualified under Section 10 of the United States Arbitration Act. It is apparent, however, that there is no basis for disqualifying Judge Lacey.

#### 1. Standard of Review

By its terms, Section 455 controls the disqualification of justices, judges and magis-

trates. It provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The Second Circuit has expressed skepticism as to whether other individuals operating in an adjudicative capacity, such as special masters, are subject to Section 455(a). In *Rios v. Enterprise Ass'n of Steamfitters Local 638*, 860 F.2d 1168 (2d Cir.1988), the court noted that "the terms of the statute do not cover special masters." *Id.* at 1173. *But see In re Joint E. & S. Dist. Asbestos Litig.*, 737 F.Supp. 735, 739–40 (E. & S.D.N.Y.1990) (Section 455 governs disqualification of special masters). The *Rios* court also recognized that the valuable expertise brought to a dispute by adjudicators such as special masters derives from a career in the relevant industry—thus creating a tension with the rigid requirements of Section 455(a). *See Rios*, 860 F.2d at 1174.

■ Judge Lacey is not a judge, justice or magistrate. Thus, Section 455 is not facially applicable to him. In addition, even if Section 455 controls the disqualification of adjudicators such as special masters, Judge Lacey's role is not equivalent to that of a special master. A special master is largely under the direction of the court, *see* Fed.R.Civ.P. 53(a), while Judge Lacey is charged with an adjudicatory function pursuant to a private agreement between the Government and the IBT. Indeed, the Second Circuit has held that the Independent Administrator is not a state actor because he "act[s] pursuant to the IBT Constitution—a private agreement—and not pursuant to a 'right or privilege created by the State.'" *United States v. IBT*, 941 F.2d 1292, 1296 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1991). The court added that "the position is under the control of the IBT, and remains a private, not a governmental role." *Id.; see also United States v. IBT*, 954 F.2d 801, 806 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992). Accordingly, Section 455 does not control the disqualification of Judge Lacey.

Respondent contends that if Section 455 does not govern Judge Lacey's disqualifica-

tion, then the issue of his recusal should be assessed under the United States Arbitration Act (the "Act"), 9 U.S.C. § 1 *et seq.* Section 10 of this Act provides for the vacatur of an award "[w]here there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(b). Yet another alternative standard recognizes that the Independent Administrator is an analog to the GEB and the IBT General President in the disciplinary sphere. In this vein, the Independent Administrator enjoys the same disciplinary powers as the GEB and the IBT General President. *See* Consent Decree, § F.12(A). The standards governing disqualification of these entities could also apply to the disqualification of the Independent Administrator: "In no event shall any involved officer serve on a hearing panel." IBT Const., Art. XIX, § 1(a). Thus, recusal of the Independent Administrator would be appropriate under such a standard only if he is "involved" in a dispute. As reasoned below, however, disqualification of Judge Lacey is not appropriate in this case under any of the above standards.

### 2. Analysis Under Section 455(a)

#### a. Waiver

■ Even if Section 455(a) governs the disqualification of Judge Lacey, Mr. Ligurotis has forfeited this claim by failing to raise it before the Independent Administrator upon learning of the facts allegedly supporting recusal. "While § 455 does not explicitly contain a timeliness requirement for the filing of a recusal claim, timeliness has been read into this section." *Polizzi v. United States*, 926 F.2d 1311, 1321 (2d Cir.1991) (citing *In re IBM Corp.*, 618 F.2d 923, 932 (2d Cir.1980)); *Apple v. Jewish Hosp. & Medical Center*, 829 F.2d 326, 333 (2d Cir. 1987). *Cf. Hardy v. United States*, 878 F.2d 94, 97 (2d Cir.1989) (Section 455(a) claim "may be raised on collateral attack only if asserted promptly upon learning the facts alleged to warrant recusal and may not be raised collaterally if the opportunity to do so existed at a time when direct review was available"). Whether respondent raised the recusal issue in a timely fashion "presents a

serious threshold question." *Apple*, 829 F.2d at 333.

■ In addressing this point, courts must consider the extent of respondent's participation in trial or pre-trial proceedings, whether granting the motion would result in wasting judicial resources, whether the motion was made after entry of judgment and whether the movant can demonstrate good cause for the delay. *See id.* at 334. The Second Circuit added that two concerns prompted enactment of this rule: "First, judicial resources should not be wasted; and, second, a movant may not hold back and wait, hedging its bets against the eventual outcome." *Id.; see United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir.1991).

In *Apple*, the Second Circuit rejected a recusal motion as untimely because it had been made two months after learning of the facts giving rise to a recusal basis. *See Apple*, 829 F.2d at 334. The court denied the motion based solely on the two-month delay, noting that such a time lag outweighed the facts that granting the motion would not waste judicial resources and that the movant did not wait until the outcome of the litigation before bringing the motion. *See id.* at 334; *see also United States v. Durrani*, 835 F.2d 410, 427 (2d Cir.1987) (rejecting motion to disqualify as untimely given that movant filed the motion four months after the events supposedly giving rise to bias, and because the filing of the motion on the eve of trial suggested an intent to delay the proceedings). Similarly, in *United States v. Yonkers Board of Education*, 946 F.2d 180 (2d Cir. 1991), the court found a recusal motion untimely because the movant had at least two prior opportunities to make the motion and the movant failed to demonstrate good cause for seeking recusal at a later date. *See id.* at 183.

Mr. Ligurotis' recusal request is untimely. He has premised his argument for recusal on Judge Lacey's service as Independent Counsel. Judge Lacey was appointed Independent Counsel on October 16, 1992, and, as the Government notes, news of this appointment appeared on the front page of virtually every major newspaper in the country. *See Letter from Steven C. Bennett, Assistant United States Attorney, to Judge David N. Edelstein*, at 2 n. 2 (Dec. 29, 1992) (on file in the Southern District of New York). Mr. Ligurotis acknowledges the press coverage of this appointment in his memorandum of law, which contains citations to New York Times and Associated Press stories that appeared on October 17 and October 20. Mr. Ligurotis makes no attempt to explain his failure to raise the recusal issue in October 1992. Respondent's assertion that he only recently learned of this Court's November 2, 1992 Opinion & Order—which addressed whether Judge Lacey could serve both as Independent Counsel and as a member of the Independent Review Board of the International Brotherhood of Teamsters (the "IRB")—is a non-sequitur. This Court's Opinion did not give rise to a basis for recusal; instead, respondent's argument is based on Judge Lacey's October 16, 1992 appointment, a fact about which Mr. Ligurotis had contemporaneous knowledge. Mr. Ligurotis' failure to raise this issue for another two months renders his argument untimely. Such a finding is strengthened by the fact that Mr. Ligurotis raised the recusal issue only after Judge Lacey rendered his decision. Such a sequence suggests that Mr. Ligurotis held back on the argument in order to hedge his bets against the eventual outcome, which implicates a concern that animates the waiver doctrine in the recusal sphere. *See Yonkers Bd. of Educ.*, 946 F.2d at 183; *Apple*, 829 F.2d at 334.

In addition, other factors enunciated in *Apple* support a conclusion that respondent has forfeited his recusal argument. Compelling Judge Lacey's recusal after he has conducted hearings and rendered a decision would require duplicating the adjudicative process, and thus, would waste judicial resources. Furthermore, respondent has proffered the recusal argument after the entry of judgment and he has not even alleged a good cause for the delay. *See Apple*, 829 F.2d at 333. In sum, Mr. Ligurotis' recusal request at this late stage in the proceedings constitutes an abuse of the judicial process. Rather than raising the claim upon discovering facts that allegedly suggest bias—and thus confronting directly the person whose dis-

qualification he seeks—respondent allowed Judge Lacey to proceed to judgment and then raised the issue for the first time in this tribunal. Such an approach implicates virtually every concern that led to the Second Circuit's adoption of a timeliness requirement. Accordingly, respondent's recusal claim under Section 455 is denied as untimely.

b. Recusal Is Not Appropriate
Under Section 455(a)

■ Even assuming that Section 455(a) controls the issue of whether Judge Lacey should have recused himself in this matter, and further supposing that respondent has not waived this argument, it is clear that recusal is not appropriate under this Section. Title 28, United States Code, Section 455(a), provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

■ A judge is obligated not to recuse himself where grounds for recusal do not exist. See SEC v. Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir.1988), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). "In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." Drexel, 861 F.2d at 1312; see United States v. Helmsley, 760 F.Supp. 338, 341–42 (S.D.N.Y.1991). Therefore, recusal is not warranted for "remote, contingent, or speculative" reasons. Drexel, 861 F.2d at 1313. Any other rule would bestow upon litigants the power to force the disqualification of judges who are not to their liking. While litigants are entitled to an impartial judge, they have no right to the judge of their choice. See id., at 1315.

■ When construing whether recusal is appropriate under Section 455(a), courts are to apply an objective test that "assumes that a reasonable person knows and understands all the relevant facts." Id. at 1313 (emphasis

in original). Under such a standard, a judge must consider not only whether actual prejudice exists, but also whether the situation bears the appearance of impartiality. See United States v. Johnpoll, 748 F.Supp. 86, 90 (S.D.N.Y.1990), aff'd, 932 F.2d 956 (2d Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 229, 116 L.Ed.2d 185 (1991); Lamborn v. Dittmer, 726 F.Supp. 510, 516 (S.D.N.Y.1989).

This Court previously addressed whether Judge Lacey's service as Independent Counsel affects his ability to serve impartially as member of the IRB. See November 2, 1992 Opinion & Order, 808 F.Supp. 271 (S.D.N.Y. 1992). In that ruling, this Court found that Judge Lacey's role as Independent Counsel did not create the danger of actual bias, nor did it foster the appearance of bias. See id. Because that ruling applies with equal force in this situation, and for the sake of convenience, the relevant portion of this Court's November 2, 1992 ruling is reproduced below: This Court found that

The duties Judge Lacey will perform as Independent Counsel pose no significant threat to his impartiality. In fact, far from promoting a pro-Government bias, the nature of Judge Lacey's assignment may place him in an adversarial posture toward the Government. Judge Lacey is charged with, among other tasks, searching for "improprieties" in the Justice Department's investigation of the BNL matter and investigating "all aspects" of CIA document production in connection with the BNL matter. Letter from William P. Barr, Attorney General of the United States, to Frederick B. Lacey, Independent Counsel (October 16, 1992) (on file in the Southern District of New York). In discharging this function, Judge Lacey enjoys "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice." See 28 C.F.R. § 600(a). It would savage credulity to say that Judge Lacey, in the process of investigating and possibly prosecuting those in Government, including employees of the Department of Justice, would lose his impartiality as a member of the IRB and suddenly become predisposed to rule in the Government's

favor. Judge Lacey must critically evaluate the Government's conduct, not ratify it.

Furthermore, although appointed by the Attorney General, Judge Lacey is not the Attorney General's clone. Judge Lacey enjoys, as his title suggests, independence from the Government. An Independent Counsel "may be removed from office, other than by impeachment and conviction, only ... for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of the Independent Counsel's duties." 28 C.F.R. § 600.3(a)(1). Even if dismissed, Judge Lacey is entitled to judicial review of the removal decision, and may obtain reinstatement or other appropriate relief. *See* 28 C.F.R. § 600.3(a)(3). In reality, his sole "ties" to the Government are his appointment by the Attorney General and his use of Department of Justice resources. Having been appointed, his mandate is to uncover wrongdoing within governmental agencies and expose flaws in governmental investigations.

In sum, the position of Independent Counsel requires Judge Lacey not only to be independent of the Government, but also to adopt an adversarial stance toward it. Moreover, Judge Lacey is not an entrenched member of the federal bureaucracy, or employed full-time with the Government, but rather is an individual employed in the private sector who has consented to perform a specific task at the request of the Attorney General. Such temporary service by one not otherwise associated with the Government does not ... [raise legitimate concerns of bias]. Thus, the argument that Judge Lacey is technically "within" the Department of Justice or an "inferior officer" of the United States, *see In re Sealed Case,* 829 F.2d 50, 56 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1027 [108 S.Ct. 753, 98 L.Ed.2d 765] (1988), makes no relevant point.... The nature of his role as Independent Counsel, and the tasks he will perform in that capacity, simply do not subvert Judge Lacey's ability to serve as an impartial member of the IRB nor do they create an "intolerable appearance of bias." August 19, 1992

Opinion & Order, 803 F.Supp. 761, 797 (S.D.N.Y.1992).

The IBT nevertheless contends that because Judge Lacey is paid by the Government for performing the discrete function of an independent counsel and because Judge Lacey took an oath as Independent Counsel to support and defend the Constitution, he occupies a position with the Government.... The IBT has proffered factors that go to whether, in a literal sense, Judge Lacey is a Government employee, rather than whether he will be, in actuality and appearance, an impartial member of the IRB. As already noted, Judge Lacey's impartiality is not threatened by his serving as Independent Counsel. An example illuminates the shallow nature of the IBT's argument. Like an Independent Counsel, a federal judge is paid by the Government, and also must take an oath to support and defend the Constitution. Taking the IBT's argument to its logical conclusion, all federal judges occupy "positions with the Government," such that they could not impartially address matters where the Government is a party. Nevertheless, it is the unquestioned responsibility of every federal judge to try all cases in a just and impartial fashion. More often than not, the Government is a party in the matters heard in federal court; nevertheless, the fact that the Government issues a judge's paycheck in no way compromises his or her ability or duty to render fair and impartial decisions. It is ludicrous even to suggest that a federal judge be barred from adjudicating matters where the Government is a party. Similarly, the fact that Judge Lacey is paid by the Government for serving as Independent Counsel and the fact that he took an oath of office in no way negates or impairs his ability to render impartial decisions.

November 2, 1992 Opinion & Order, 808 F.Supp. at 274–75 (S.D.N.Y.1992); *see also* January 26, 1993 Memorandum & Order, *slip opinion* at 6–11, 1993 WL 22131 at * 3–6 (S.D.N.Y.1993).

Although Mr. Ligurotis expounds on the fact that Judge Lacey was appointed Independent Counsel by the Attorney General of

the United States pursuant to a federal regulation, 28 C.F.R. § 600, rather than by the Court of Appeals for the District of Columbia pursuant to 28 U.S.C. § 591 *et seq.*, this is a difference without significance for purposes of respondent's claim. Judge Lacey, as Independent Counsel appointed under a federal regulation, enjoyed the same independence, including the same protection against removal without cause, as an Independent Counsel appointed pursuant to statute. *Compare* 28 C.F.R. § 600.3 *with* 28 U.S.C. § 596. Furthermore, as this Court's Opinion makes clear, while he served as Independent Counsel Judge Lacey was not only independent of the Government, but also occupied a position that placed him in an adversarial posture toward the Government. In addition, far from being an entrenched member of the federal bureaucracy or a full-time employee of the Government, Judge Lacey performed a one-time task wholly unrelated to his role as Independent Administrator. Accordingly, Judge Lacey's service as Independent Counsel created neither the danger of actual partiality or the impermissible appearance of partiality. Respondent has not alleged any facts, nor has he proffered any legal reasoning, that undermine the validity of this finding.

### 3. Analysis Under Section 10 of the United States Arbitration Act

 Similarly, recusal of Judge Lacey is not appropriate under the more flexible test for disqualification contained in the United States Arbitration Act. An arbitration award must be vacated upon a finding of "evident partiality," which exists " 'where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.' " *Local 814, Int'l Bhd. of Teamsters v. J & B Installers & Moving, Inc.*, 878 F.2d 38, 40 (2d Cir.1989) (quoting *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir.1984)). Proof of actual bias or "outright chicanery" is often impossible to obtain, and thus is not required to show evident partiality; instead, courts should consider the totality of the circumstances in deciding the existence of evident partiality. *Commonwealth Coatings Corp. v.*

*Continental Casualty Co.*, 393 U.S. 145, 150–51, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968) (White, J., concurring); *see Morelite*, 748 F.2d at 84; *Sun Refining & Marketing Co. v. Statheros Shipping Corp.*, 761 F.Supp. 293, 298 (S.D.N.Y.), *aff'd*, 948 F.2d 1277 (2d Cir. 1991). Relevant factors include peculiar commercial practices in the geographic area, an arbitrator's financial interest in the arbitration, the nature of the relationship between the arbitrator and the alleged favored party, and whether the relationship existed during the arbitration. *Morelite*, 748 F.2d at 84; *Pompano–Windy City Partners v. Bear Stearns & Co.*, 794 F.Supp. 1265, 1278 (S.D.N.Y.1992); *Sanford Home for Adults v. Local 6, IFHP*, 665 F.Supp. 312, 320 (S.D.N.Y.1987).

 As with his argument under Section 455, respondent has waived an argument for recusal based upon the standard contained in the United States Arbitration Act because he delayed raising the disqualification issue until this late date. *See, e.g., York Research Corp. v. Landgarten*, 927 F.2d 119, 122 (2d Cir. 1991). In addition, the above summary of the "evident partiality" standard reveals that it will not cause the disqualification of an individual who passed scrutiny under the far more stringent standard contained in Section 455. Respondent has alleged a generalized and speculative form of bias that does not approach a showing of evident partiality. Given that Judge Lacey's recusal is not appropriate under section 455's more rigid standard, it is obvious that disqualification is not appropriate under the standard contained in the United States Arbitration Act.

### B. The Independent Administrator's Decision Is Neither Arbitrary nor Capricious

 In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir. 1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they

are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, ─── U.S. ───, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* December 10, 1992 Opinion & Order, 808 F.Supp. 279, 281 (S.D.N.Y.1992); July 14 Opinion & Order, 803 F.Supp. 748, 754 (S.D.N.Y.1992); July 13 Opinion & Order, 803 F.Supp. 740, 745 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y. 1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1352 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345 (S.D.N.Y. 1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip opinion*, at 4–5, 1991 WL 244905 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.1992), *cert. denied*, ─── U.S. ───, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip opinion*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir. 1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip opinion*, at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip opinion*, at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1991); July 18, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1991); July 16, 1991 Opinion & Order, *slip opinion*, at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, ─── U.S. ───, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd*, 907 F.2d 277 (2d Cir.1990).

### 1. Charge One: Improper Financial Transactions

a. The Independent Administrator's Finding that Respondent Received an Improper Loan Is Not Arbitrary or Capricious

 The Independent Administrator found that Mr. Ligurotis violated Local 705 Bylaws and LMRDA § 503 when Mr. Ligurotis caused Local 705 to issue checks to the Funds in the amount of $120,000 at a time when his "salary reductions" amounted only to $47,500. LMRDA § 503 provides in relevant part that

> No labor organization shall make directly or indirectly any loan or loans to any officer or employee of such labor organization which results in a total indebtedness on the part of such officer or employee to the labor organization in excess of $2,000.

29 U.S.C. § 503(a). Local 705 Bylaw § 14(A)(3) allows the Executive Board to "[l]oan and borrow monies directly or indirectly ... to the extent provided by law." The Independent Administrator concluded that the Executive Board did not contemporaneously authorize issuance of the checks to the Funds, and thus, never approved what was effectively a loan to Mr. Ligurotis. Ind. Admin. Dec. at 11. By orchestrating such a loan, Mr. Ligurotis violated federal labor law and Local 705 policy.

Respondent argues, as he did before the Independent Administrator, that the Independent Administrator's conclusion is flawed because: (1) respondent was not liable to the

Funds in the first place under the terms of the trust agreement and pursuant to the doctrines of contribution and indemnity, and thus, he could not have received an illegal loan; (2) LMRDA Section 503 is not applicable in this case because any loan to respondent was in his capacity as Funds administrator, not as an officer of Local 705; and (3) Mr. Ligurotis did not act willfully in connection with any violation of § 503.

As to the issue of respondent's liability to the Funds, it is not disputed that Mr. Schumi's letter indicated that Mr. Ligurotis would pay the full $120,000 to the funds: the source of the repayment was to be "salary authorized but not taken by Daniel C. Ligurotis as Secretary Treasurer of the Union." Furthermore, respondent's salary reductions ultimately comported with Mr. Schumi's assertion because they eventually offset the Local's payment to the Funds. Respondent even admits in his memorandum of law that he "volunteered to repay" the $120,000 to the Funds. *Respondent's Memorandum of Law,* at 21. Given these facts, it is hardly surprising that the Independent Administrator found that all parties intended for Mr. Ligurotis alone to repay the $120,000 he received as compensation for administering the Funds. Ind. Admin. Dec. at 12.

Counsel's arguments to the contrary are not only unpersuasive, but are wholly unreasonable. Mr. Ligurotis' counsel proffers the outlandish argument that pursuant to the trust agreement, respondent is not liable for the improper decision of his co-trustees to award him $120,000 in compensation. Instead, his co-trustees are liable for this sum and Mr. Ligurotis is entitled to contribution from them. To appreciate the audacity of this argument, it is necessary to review briefly the facts of this case. Mr. Ligurotis received $120,000 that he had no right to accept. Nevertheless, he accepted this money. He decided to repay the sum only after intervention from various Government agencies, which eventually included a suit filed by

DOL in federal district court.[4] Initially, he reimbursed the Funds at a leisurely rate through periodic "salary reductions." Having apparently found even this sedate repayment schedule too burdensome, or perhaps fearing further governmental action following the signing of the Agreement with DOL, Mr. Ligurotis leveraged his position as Secretary–Treasurer and had the Local repay the Funds. In doing so, he received a second improper payment in the form of an illegal loan. By arguing that the trust agreement absolved him of liability, counsel merely omitted to consider the persuasive evidence to the contrary. By contending that Mr. Ligurotis is entitled to contribution because his co-trustees improperly decided to award him the $120,000, counsel argues for granting respondent the $120,000 to which he had no right in the first place. This is a frivolous argument that asks this Court not only to ignore, but actually to sanction and reward Mr. Ligurotis' illegal financial dealings. Despite counsel's efforts, respondent may not reap personal monetary gain through illegal loans and payments that stem from the improper manipulation of Union office.

 Mr. Ligurotis also avers that LMRDA Section 503 applies only to money received by officers, and he received the $120,000 compensation as administrator of the Funds, not as an officer of the Local. This Court finds, as did Independent Administrator, that this argument is devoid of merit because "Ligurotis had the authority to disburse Local 705 funds only by virtue of his position as Secretary–Treasurer of the Local." Ind. Admin. Dec. at 12. Thus, although the $120,000 liability to the Funds derived from his work as administrator of the Funds, he was able to have Local 705 issue checks, and thus was able to obtain the illegal loan, because of his position as an officer of the Local. Such conduct transgresses LMRDA § 503.

 Mr. Ligurotis also asserts that he did not act willfully[5] in obtaining any illegal

---

4. Although Mr. Ligurotis asserts that he began to repay the $120,000 before reaching the Agreement with DOL that resolved the litigation, it is undisputed that he commenced repayment after DOL had begun its investigation in this matter.

5. LMRDA Section 503(c) provides that "[a]ny person who willfully violates this section shall be fined not more than $5,000 or imprisoned for not more than one year, or both." 29 U.S.C. § 503(c).

loan, and thus, did not violate LMRDA § 503. Respondent's salary reductions, however, initially lasted only for five months, which obviously produced an amount that was insufficient to cover the Local 705 payment. That he authorized the checks to the Funds knowing about this deficiency yields the conclusion that Mr. Ligurotis acted willfully. While Mr. Ligurotis asserts that he did not realize that his "salary reductions" ceased, the Independent Administrator found this testimony incredible. Ind. Admin. Dec. at 13. This Court will not substitute its assessment of respondent's credibility for that of the Independent Administrator, who was present during respondent's testimony and thus in the best position to judge credibility. *See* July 9, 1992 Opinion & Order, 803 F.Supp. 734 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345 (S.D.N.Y.1992), *aff'd in relevant part,* 978 F.2d 68 (2d Cir.1992); January 28, 1992 Memorandum & Order, *slip opinion* at 4, 1992 WL 18280 (S.D.N.Y.1992); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1133 (S.D.N.Y.1991), *aff'd,* 964 F.2d 1308 (2d Cir.1992). It is also worth noting that even if Mr. Ligurotis did not realize that the "salary reductions" had ceased, at the time the checks issued in August 1988 these deductions would not have amounted to $120,000 even had they continued uninterrupted.

Finally, respondent asserts a lack of willfulness because he allegedly acted on the advice of Mr. Timothy Donahue, the manager of Local 705's accounting department. Mr. Donahue supposedly sanctioned the issuance of Local 705 checks to the Funds. The Independent Administrator rejected this argument and found that respondent did not make an inquiry into whether his salary reductions would cover the Local 705 checks: "It is apparent that Ligurotis did not make this inquiry because he either knew that he had not accumulated enough "salary reductions" to satisfy the $120,000 obligation, or he did not care." Ind. Admin. Dec. at 13. Even if Mr. Donohue sanctioned the transaction, however, this imprimatur cannot insulate respondent from the Investigations Officer's charge. Posing a single question and receiving in reply a cursory answer produces, at best, willful ignorance, which does not negate scienter: Respondent asked "is everything okay, he said everything is fine. He said we are having a cashflow problem, but its okay." *Investigations Officer's Memorandum of Law,* at 26. As this Court has noted in another context, "[w]hat [respondent] claims to constitute an investigation ... amounted to no more than a calculated attempt to further the existing situation." *See* May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1356 (S.D.N.Y.1992), *aff'd,* 981 F.2d 1362 (2d Cir.1992). In addition, the evidence suggests, and the Independent Administrator found, that Mr. Ligurotis had actual knowledge of the illegal loan. His claims to the contrary are unavailing. Accordingly, the Independent Administrator correctly found that the Investigations Officer had satisfied his burden of proof as to the illegal loan charge.

b. The Independent Administrator's Finding that Respondent Embezzled Union Funds Is Not Arbitrary or Capricious

The Independent Administrator found that Mr. Ligurotis violated LMRDA § 501(c) and Article XIX, § 6(b)(3) of the IBT Constitution by granting himself a $77,000 retroactive pay raise. Section 501(c) provides that

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the monies, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c). Section 6(b)(3), as previously noted, makes embezzlement a ground for union discipline. The Independent Administrator found that the Investigations Officer sustained his burden of showing that in procuring this salary increase without Executive Board approval, Mr. Ligurotis acted with fraudulent intent to deprive Local 705 of its funds. *See* Ind. Admin. Dec. at 14; *see also* November 8, 1991 Memorandum & Order, *slip opinion* at 5–6, 1991 WL 243268 (S.D.N.Y.1991) ("*Nunes*") (applying fraudu-

lent intent standard in connection with charge of embezzling union funds), *aff'd,* 962 F.2d 4 (2d Cir.1992); November 8, 1991 Memorandum & Order, *slip opinion* at 11, 1991 WL 243292 (S.D.N.Y.1991) ("Local 295") (same); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1126 (S.D.N.Y. 1991) (same), *aff'd,* 978 F.2d 706 (2d Cir. 1992).

Mr. Ligurotis, as his counsel acknowledges, had no right to a pay raise absent Executive Board Approval pursuant to Section 14(A)(2) of Local 705's Bylaws. The issue, then, is not whether the pay raise was proper, but rather whether respondent acted with fraudulent intent in orchestrating this admittedly improper pay raise. This Court concludes that the evidence amply supports the Independent Administrator's finding of fraudulent intent.

On February 16, 1988, Mr. Ligurotis informed Mr. Donahue, Local 705's accountant, that respondent's salary had been increased to $18,750 each month and that this increase was retroactive to October 1, 1987. Mr. Donahue assumed that respondent had received Executive Board approval, although respondent never mentioned obtaining such approval. Ten days later, on February 26, 1988, the Local 705 Executive Board held its monthly meeting. The minutes of this meeting, however, contain no entry concerning Mr. Ligurotis' pay raise. The fact that Mr. Ligurotis told Mr. Donahue of his pay raise well before the Executive Board's monthly meeting, coupled with the absence of an entry in the minutes concerning the pay raise, suggest that respondent unilaterally awarded himself a salary increase knowing and not caring that he did not have Executive Board approval. Thus, Mr. Ligurotis intentionally set out to and did obtain union funds to which he knew he had no right, and thus acted with fraudulent intent.

Mr. Ligurotis attempts to show that he did receive contemporaneous Executive Board approval by pointing to an entry contained in the minutes of the April 1989 Executive Board meeting, which is the first mention of respondent's pay raise. The April 20, 1989 meeting minutes state that

> The Board received a report from Secretary–Treasurer Daniel C. Ligurotis on the Pension Fund and Health and Welfare Fund compliance with the consent order [with DOL]. In reviewing the matter, the Board noted that the minutes of the February 26, 1988 Board meeting do not state one item approved. That item was an increase in the salary of Secretary–Treasurer Daniel C. Ligurotis by $77,000.00 to an annual salary of $225,000.00 retroactive to October 1, 1987. The Board unanimously ratified and approved the increase retroactive to October 1, 1987, and to correct the omission.

Ind.Admin. Dec. at 16. This subsequent attempt at ratification, however, does not insulate respondent from the embezzlement charge. Aside from this supposed ratification, no evidence supports the proposition that the Executive Board actually discussed and approved Mr. Ligurotis' salary increase at the formal February 1988 meeting. The ratification—on its own—simply is not sufficiently weighty to counterbalance the other evidence in this case that shows by a preponderance of the evidence that Mr. Ligurotis acted with fraudulent intent.

In addition, the assertion contained in the ratification—that the Executive Board granted contemporaneous approval for the pay raise—is suspect. Mr. Ligurotis received his first check at an enhanced salary ten days *before* the relevant February 1988 Executive Board meeting. Thus, the supposed ratification relates back to a time when the conduct in question already had occurred. Such a sequence casts doubt on whether the Executive Board approved the raise in 1988.[6]

---

6. Respondent also argues that he had no motive to embezzle funds through this salary increase because there is no evidence that he knew of the DOL investigation in February 1988. Mr. Ligurotis' argument fails to take into account that his "salary reductions," which were paid to the Funds, commenced in August 1988—relatively soon after he received this increase. In addition, the increase occurred subsequent to DOL's having interviewed the Funds' attorney and the accountant for Local 705's pension plans, both of whom presumably interacted with respondent on a regular basis. The salary increase, then, certainly could have been an attempt to soften the financial blow of having to repay the Funds.

Moreover, other events occurring in April 1989 undermine the veracity of the information contained in the April 1989 meeting minutes. The April 1989 ratification coincided with the April 20, 1989 deadline contained in respondent's agreement with DOL for repayment to the Funds, and with Local 705's issuance of checks to the Funds in satisfaction of this repayment. The confluence of these three events suggests that the ratification did not correct an innocent omission, but rather, anticipating closer scrutiny of his financial dealings with the Local, Mr. Ligurotis made an after-the-fact attempt to obscure prior illegal activity. Such a ratification does little to bolster respondent's position, however, because it was made under suspicious circumstances, occurred over one year after the events in question, and seeks to authorize action that already had occurred.

Indeed, the April 1989 ratification appears to be another episode in a disturbing sequence involving respondent's abuse of Union office for personal advantage. Mr. Ligurotis secured an improper loan by using his power as Secretary–Treasurer to have the Local issue checks in his behalf. In April 1989, respondent apparently again used his position improperly to have the Executive Board ratify his past misconduct in obtaining the salary increase. In any event, this Court agrees with the Independent Administrator that the April 1989 Executive Board meeting minutes do not undermine a finding of fraudulent intent. The evidence indicates that Mr. Ligurotis knowingly violated the Local's By-laws by granting himself a retroactive pay raise without Executive Board authorization. Respondent thus willfully took funds to which he had no right.

Perhaps aware of the tenuous nature of his ratification argument, Mr. Ligurotis also asserts that the Executive Board approved the salary increase at an "informal meeting" in February 1988. The Independent Adminis-

trator, however, found no evidence of such an informal meeting. Ind.Admin. Dec. at 17–18. This conclusion is amply supported by the evidence. Respondent's argument is facially suspect: "A $77,000 a year retroactive pay raise for the Local's principal executive officer is exactly the type of item which would usually be clearly documented at a regular meeting of the Executive Board." Ind.Admin. Dec. at 18. Moreover, the Independent Administrator did not credit the testimony of three board members as to whether such a meeting occurred due to material inconsistencies among the three versions presented. *See id.* at 18–19. As previously noted, this Court will not supplant the Independent Administrator's assessment of credibility with its own. *See supra* at 1177–78. Thus, this Court agrees with the Independent Administrator that respondent's informal meeting theory is without merit, given "[t]he scarce and contradictory evidence presented, combined with the implausibility of the assertion that the Secretary–Treasurer would be given a $77,000 pay raise 'off the record.' " [7] Ind.Admin. Dec. at 19.

In the mire of financial transactions present in this matter, it is easy to lose sight of the gravity of respondent's conduct. As this Court has noted, " '[e]ach IBT ... officer is a fiduciary with respect to the Union members.' As a fiduciary, an IBT officer enjoys the trust of the general membership. In exchange for this privilege, each officer is bound to serve the membership's interests." May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y.) (quoting March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989)), *aff'd,* 981 F.2d 1362 (2d Cir. 1992). In common parlance, respondent took $77,000 from Local 705 without approval from any member or entity associated with Local 705, and pocketed it. By appropriating funds that belonged to the rank-and-file

---

7. Mr. Ligurotis offers this Court, as he did the IA, the character testimony of various individuals. Respondent asserts that "[b]ased on the caliber of the witnesses and their unequivocal praise for Ligurotis' reputation for honesty and integrity, the IA had to infer that Ligurotis acted on the occasions in question consistently with his character." *Respondent's Memorandum of Law,* at 43. Unfortunately for Mr. Ligurotis, the evi-

dence supports the Independent Administrator's finding that Mr. Ligurotis embezzled $77,000 from Local 705. Rather than exhibiting the virtues of honesty and integrity, Mr. Ligurotis' actions inflicted financial harm on the general membership of the Local and violated the trust of the rank-and-file, whose interests he purported to represent.

solely to meet his personal financial needs, Mr. Ligurotis sold out the membership and abused the privilege of holding union office. This gross dereliction of responsibility inflicted actual financial harm on the general membership. *Cf. United States v. IBT*, 905 F.2d 610, 623 (2d Cir.1990) (affirming this Court's and Independent Administrator's finding that embezzling funds of a *non-IBT* labor brought reproach upon the Union).

### 2. The Independent Administrator's "Pattern of Conduct" Finding Is Not Arbitrary or Capricious

██ In addition to violating the IBT Constitution by engaging in improper financial transactions, the Independent Administrator found that Mr. Ligurotis brought further reproach upon the Union by engaging in a pattern of conduct that rewarded corruption and allowed unlawful activity to flourish. As previously noted, the conduct that comprises this pattern consists of three distinct actions: (1) Mr. Ligurotis' decision to hire as Local 705 employees three individuals with criminal backgrounds; (2) respondent's possession of a loaded handgun on the premises of Local 705; and (3) respondent's contempt for the orders of this Court and the Consent Decree. Although the Independent Administrator found that no one single element of this pattern constituted a violation of the IBT Constitution, he found that taken as a whole, the conduct brought reproach upon the Union in violation of the IBT Constitution.

██ As a threshold matter, it is worth noting that the Independent Administrator has the authority to find that a pattern of conduct constitutes a violation of the IBT Constitution, even if no single element of the pattern is itself a violation. The Independent Administrator's authority to interpret the IBT Constitution is beyond reasonable dispute. The Consent Decree grants the Independent Administrator the disciplinary authority of the IBT General President and the GEB. *See* Consent Decree, § F.12(A). In interpreting this provision, the Second Circuit has held that "the [Independent] Administrator's comprehensive right to review disciplinary charges of the GEB necessarily includes the final authority to determine

what constitutes an offense subject to discipline under the IBT Constitution." *United States v. IBT*, 905 F.2d 610, 619 (2d Cir. 1990); *see* March 13, 1990 Opinion & Order, 743 F.Supp. 155, 163–64 (S.D.N.Y.1990). In this case, the Independent Administrator has concluded that through a pattern of conduct that allowed corruption to fester in Local 705, respondent brought reproach upon the Union. This is a reasonable basis upon which to discipline IBT members, and one which the Independent Administrator could choose to rely upon given that he possesses final authority to interpret the IBT Constitution.

In addition, the evidence supports the Independent Administrator's finding that Mr. Ligurotis engaged in a pattern of conduct that allowed corruption to flourish within Local 705. The feature common to all three actions is a disregard for the rule of law. Whether knowingly violating a Local 705 By-law, a lawful order of this Court, or a federal labor statute, Mr. Ligurotis repeatedly has demonstrated a willingness not to allow legitimate rules to interfere with his desired course of conduct. In acting as if the law does not apply to him, Mr. Ligurotis, the highest ranking officer of Local 705, not only tacitly sanctioned corrupt practices, but became an active participant in them. Therefore, the Independent Administrator was not arbitrary or capricious in finding that this pattern of conduct brought reproach upon the Union.

#### a. Mr. Ligurotis' Hiring Decisions

As to respondent's hiring patterns, the Independent Administrator found that Mr. Bravieri and Mr. Green had pled guilty in 1982 to charges that they extorted money from employers. Although Mr. Bravieri requested that Mr. Ligurotis reinstate him as a business representative, respondent could not do this under Section 504 of the LMRDA. Respondent instead employed Mr. Bravieri in a maintenance position until the statutory bar that prohibited him from holding Union office expired, at which time respondent appointed Mr. Bravieri a business representative. The Independent Administrator found that Mr. Ligurotis hired Mr. Green as a night watchman for three and one half years

solely to assure that Mr. Green satisfied the pension fund's years-of-service requirement.

Finally, Mr. Fickett was a Local 705 shop steward when he was convicted of arson in 1986. Although DOL notified Mr. Fickett that he was not eligible for Local 705 employment for 13 years, Mr. Ligurotis nevertheless hired him as a business representative. He discharged Mr. Fickett only after the Investigations Officer requested sworn responses to written questions concerning Mr. Fickett's employment. The Independent Administrator found that respondent's sole inquiry into Mr. Fickett's employability was to consult with a Local 705 attorney and to ask Mr. Fickett a single cursory question.

Mr. Ligurotis does not attempt to refute the facts surrounding his decision to hire these three individuals, but rather he disputes the meaning to be derived from the hirings. The issue, then, is not whether respondent hired Messrs Bravieri, Green and Fickett in the circumstances described by the Independent Administrator, but whether or not it was arbitrary and capricious for the Independent Administrator to consider these hirings as part of a pattern of conduct that brought reproach upon the Union. Like the Independent Administrator, this Court finds that the hirings are properly considered part of a disturbing pattern of conduct that rewarded corruption in Local 705.

This Court has opined that corruption "in the IBT is wholly inconsistent with the interests of the rank and file. Accordingly, every IBT officer must, with unstinting effort and steely resolve, wage an active campaign to purge the Union of the hideous influence of organized crime." May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1353 (S.D.N.Y. 1992), aff'd, 981 F.2d 1362 (2d Cir.1992). It does not require a quantum leap of cognition to conclude that, absent a countervailing explanation, hiring individuals with criminal backgrounds can at times be inconsistent with a commitment to cleanse the IBT of corrupt influences. The Independent Administrator found, and this Court agrees, that this is one such instance. Mr. Bravieri and Mr. Green pled guilty to charges of labor racketeering, while Mr. Fickett was convicted of arson. These are extraordinarily seri-

ous offenses. Moreover, the circumstances surrounding their hiring suggest an improper motive. As to the hiring of Mr. Green and Mr. Bravieri, the Independent Administrator found that "[i]t is clear that both men were given special favors of 'stop-gap' employment until they either were legally permitted to move to another job or retire on a pension." Ind.Admin. Dec. at 24. In addition, the hiring of Mr. Fickett constituted a violation of Section 504(a) of the LMRDA, which prohibits a union from employing a person convicted of certain crimes, including arson, "for a period of thirteen years after such conviction." 29 U.S.C. § 504(a). Perhaps more disturbing than the illegal hiring, however, was respondent's utter lack of investigation into whether he legally could hire Mr. Fickett. This lack of inquiry suggests an indifference to federal labor statutes and the harm that they are designed to prevent, which in this case is the introduction of potentially corrupt influences into the Union. See 29 U.S.C. §§ 401(b)-(c). Indeed, in light of the three hirings, the Independent Administrator properly could conclude that respondent "acted with great eagerness to accept back into the fold those individuals with criminal backgrounds.... Ligurotis has shown a pattern of presumption and bias *in favor* of hiring and helping those who have shown contempt for the law and the IBT." Ind.Admin. Dec. at 25–26 (emphasis in original). Therefore, it was not arbitrary or capricious for the Independent Administrator to find that respondent's hiring of these three individuals in the above circumstances was an element in a pattern of behavior that allowed corruption to flourish within Local 705.

It is important to note that neither the Independent Administrator nor this Court concluded that the hiring of Mr. Bravieri or Mr. Green violated the LMRDA. Indeed, neither the Independent Administrator nor this Court have asserted that hiring an individual with a criminal background necessarily suggests an impermissible indifference to corruption. See United States v. Local 560, 581 F.Supp. 279 (D.N.J.1984). What is clear, however, is that conduct that is not itself criminal can constitute a violation of the IBT

Constitution. In fact, a great number of grounds for discipline in the IBT Constitution are not criminal violations, including the failure to cooperate with internal IBT investigations, knowingly associating with members of organized crime, violating a Local Bylaw and disrupting Union meetings. *See* 1991 IBT Constitution, Art. XIX, §§ 7(b)(1), (6), (9) & (12). In addition, the Second Circuit has upheld the imposition of penalties on a union officer for failing to investigate and root out corruption in the Local. *See United States v. IBT*, 981 F.2d 1362 (2d Cir.1992). Thus, the Independent Administrator correctly concluded that violating the IBT Constitution "does not require a finding that [respondent] violated the laws of the United States. And, while it is true that [respondent's] hiring of Bravieri and Green *alone* would not amount to conduct 'bring[ing] reproach upon the Union,' it is one link in the chain of reproachful conduct which encouraged and fostered lawlessness." Ind.Admin. Dec. at 25.

### b. Possession of a Loaded Handgun

As to possession of a loaded handgun, the Independent Administrator found that Mr. Ligurotis carried a loaded handgun on Local 705 premises, although the Independent Administrator credited respondent's asserted belief that he could carry the gun due to his status as an auxiliary police officer. Respondent admits possessing the gun while at the Local, but contends that this conduct it is not indicative of corrupt practices. This Court disagrees.

In carrying the weapon without having obtained a Firearm Owner's Identification Card, the Independent Administrator found that Mr. Ligurotis violated Illinois law. Ind.Admin. Dec. at 27. While he may have unwittingly violated Illinois law, he knowingly violated a Local 705 policy that prohibited possession of a loaded gun on Local 705

property.[8] Mr. Ligurotis not only knew about this policy, but he signed a statement that he would not carry a gun on the premises. In willfully transgressing Local policy and his personal pledge, Mr. Ligurotis substituted "his personal judgment for that of the Executive Board, and [thus] continu[ed] his pattern of treating all Union rules as being inapplicable to him." Ind.Admin. Dec. at 28. Thus, the Independent Administrator properly could find that this conduct contributed to a pattern of behavior that suggests sympathy to corrupt influences.

■ Mr. Ligurotis asserts that the Investigations Officer has not proved that the gun was loaded. This Court agrees with the Independent Administrator, however, who did not credit respondent's assertion: Mr. Ligurotis used the gun to shoot and kill a fellow union officer in the basement of Local 705 on August 21, 1991. Ind.Admin. Dec. at 26–27. In addition, as noted by the Investigations Officer, respondent never stated at the hearing before the Independent Administrator that he unloaded the gun before entering the Local 705 building. *Investigations Officer's Memorandum of Law*, at 30 n. 27. Respondent's contention that the gun was not loaded also is inconsistent with his assertion that he needed the gun for protection. Respondent asserts that "shots were fired into the Joint Council and the 300 South Ashland Building was evacuated following a telephone bomb threat." *Respondent's Memorandum of Law*, at 52–53. Mr. Ligurotis' asserted fear for his personal safety thus derives from incidents occurring on union property. Yet respondent would have this Court believe that he carried a loaded gun to the Union building and then unloaded it before he set foot on union property—thus disarming himself upon entering the very place of supposedly maximum danger. Such a thesis simply is not credible.[9]

8. Mr. Ligurotis' counsel takes great pains in his memorandum of law to show that his client's carrying a loaded handgun did not violate Illinois law. This Court will not engage in a lengthy analysis of Illinois law to determine whether respondent was theoretically in violation of its criminal code. The gravamen of the "loaded-handgun" aspect of the Investigations Officer's charge is that Mr. Ligurotis knowingly ignored Local 705 rules that he found inconvenient.

Whether or not such conduct constituted a violation of Illinois law, it certainly contributes to a finding that Mr. Ligurotis was an integral part of the corrupt atmosphere that he permitted to flourish at Local 705.

9. Respondent also avers that the IA had no right to adjudicate the charges against him because Article XIX, Section 7(a) of the IBT Constitution prohibits the "trial of an IBT member on charges

#### c. Mr. Ligurotis' Contumacious Conduct

Finally, the Independent Administrator found that Mr. Ligurotis' contempt citation in this Court contributed to an atmosphere of lawlessness and corruption that he allowed to flourish at the Local. Like the other behavior that forms the basis of this charge, it is not disputed that Mr. Ligurotis was found in contempt of this Court. The conduct for which he was held in contempt involved a calculated attempt to thwart the work of the Court–Appointed Officers and to undermine the effectiveness of the reforms instituted pursuant to the Consent Decree. To this end he brought suit in federal court in Chicago seeking to limit the powers of the Election Officer, even though this Court had entered an order pursuant to the All Writs Act, 28 U.S.C. § 1651, enjoining all plaintiffs in the Chicago suit, including respondent, from taking further action in connection with that suit. *See* December 12, 1989 Memorandum & Order, 726 F.Supp. 943, 947 (S.D.N.Y. 1989), *aff'd in relevant part*, 899 F.2d 143 (2d Cir.1990). This Court found that "Ligurotis' act of contempt seems deliberate, willful, intentional and shows blatant disregard for his obligations under the Consent Decree he signed and the Court that enforces its provisions." *Id.* at 949. In affirming this aspect of this Court's decision, the Second Circuit held that "there is clear and convincing evidence that Ligurotis instigated the bringing of the suit purposefully to harass the Election Officer by forcing him to relitigate some issues already decided adversely to Ligurotis." *United States v. IBT*, 899 F.2d 143, 146–47 (2d Cir.1990). While respondent asserts that the Independent Administrator should not consider the contempt charge, these arguments are frivolous and do not merit discussion. By intentionally disregarding this Court's order in a flagrant attempt to undermine the Court–Appointed Officers, Mr. Ligurotis revealed again his complete and total unwillingness to abide by lawful

rules—whether promulgated by this Court, the Local 705 Executive Board or Congress. Such behavior contributes and is integral to the nurturing of corrupt influences, which is exactly what the Consent Decree is designed to prevent.

The final segment in this trilogy—respondent's contumacious violation of the Consent Decree while an officer of Local 705—cements a pattern of wrongdoing that, according to the Independent Administrator, brought reproach upon the IBT. The Independent Administrator correctly found that "Ligurotis engaged in a pattern of disregard for any standard of conduct expected of a high-ranking union official. Such contempt for the rule of law is precisely what the Consent Decree, to which Ligurotis was a signatory, was designed to eliminate from the IBT." Ind.Admin. Dec. at 23. Such a finding is in no way arbitrary or capricious.

### 3. The Penalty Imposed By the Independent Administrator Is Not Arbitrary or Capricious

■ On each of the charges brought by the Investigations Officer, the Independent Administrator permanently barred Mr. Ligurotis from the IBT and prohibited him from receiving compensation from any IBT-affiliated entity. In order to offset the funds he unlawfully converted, the Independent Administrator also prohibited IBT-affiliated entities from paying respondent his severance. Furthermore, the Independent Administrator precluded IBT-affiliated entities from making contributions on respondent's behalf to employment benefit plans, although the Independent Administrator did not alienate his vested benefits. Finally, the Independent Administrator prohibited any IBT-affiliated entity from paying Mr. Ligurotis' legal fees in connection with this action.

involving the same set of facts as to which he is facing criminal or civil trial until his final appeal has been concluded." IBT Const., Art. XIX, § 7(a). Even assuming that this provision applies to hearings before the IA, the Section is inapplicable to respondent because the Investigations Officer's charges do not involve the same set of facts as his indictment for murder, which

resulted in respondent's acquittal. The Investigations Officer's charge involves a long-standing pattern of conduct where respondent repeatedly violated Local 705 rules, while the trial involved a one-time shooting incident. Accordingly, Section 7(a) does not preclude the filing or adjudication of disciplinary charges against Mr. Ligurotis.

Mr. Ligurotis claims that this penalty is arbitrary and capricious. Respondent argues that other IBT members found to have embezzled funds received only five-year suspensions, and that no other IBT members have received lifetime bans for engaging in a pattern of conduct that fostered corruption. This Court finds that the Independent Administrator had ample justification for the penalty he imposed on each count.

As to Charge One, which involved Mr. Ligurotis' improper financial dealings, the Independent Administrator concluded that respondent treated "the Local as if it were his 'personal piggy bank,' [and thus] ... sent the message that union officers are entitled to use the members' funds for their own pleasure. Ligurotis' actions also sent the message that with prominence and power comes privilege—the privilege of being above the rules." Ind.Admin. Dec. at 30. As to Charge Two, which involved respondent's pattern of conduct, the Independent Administrator concluded that a lifetime suspension was appropriate given that "[o]ne of the main objectives of the Consent Decree is to restore the rule of law to the IBT. When one who is in Ligurotis' position condones lawlessness, the core purpose of the Consent Decree is frustrated. All members of the IBT, no matter how prominent and important they may be, must understand that the rules of the Local Unions, and the rules contained in the IBT Constitution, apply equally to all IBT members." Ind.Admin. Dec. at 32.

It is apparent from the Independent Administrator's decision that he had a sound basis for the penalty he imposed on Mr. Ligurotis. Respondent stole from the rank and file on two separate occasions: First, he received an improper loan from Local 705 in the amount of at least $76,250, and then he embezzled $77,000 from its coffers. In addition, he repeatedly engaged in behavior that violated federal statutes, Local Bylaws and orders of this Court. Because he committed these acts while serving as the highest ranking officer of Local 705, his behavior also constitutes a breach of his fiduciary duty to the general membership, and a betrayal of the membership's trust. In sum, respon-

dent's conduct implicates concerns that animate the Consent Decree. The Independent Administrator's penalty recognizes the gravity of respondent's actions. In addition, given the Independent Administrator's broad authority and discretion in imposing sanctions on disciplined IBT members, the penalty imposed on Charges One and Two cannot be considered arbitrary or capricious. *See United States v. IBT*, 981 F.2d 1362, 1368 (2d Cir.1992) (given sound reasoning for the punishment, court upheld Independent Administrator's authority to impose harsher sanction than that imposed on other IBT members who engaged in similar misconduct).

As the Second Circuit noted when it reversed this Court's decision to overturn a penalty imposed by the Independent Administrator, "[a] court may only consider whether the [Independent] Administrator made 'an allowable judgment in [his or her] choice of remedy.'" *United States v. IBT*, 978 F.2d 68, 73 (2d Cir.1992) (quoting *Sokoloff v. Saxbe*, 501 F.2d 571, 576 (2d Cir.1974)). The court added that "[t]he experienced Independent Administrator—himself a former federal district court judge—heard the witnesses and fixed a penalty. On this record there is no basis for finding the penalty chosen by the administrator was either arbitrary or capricious." *Id.* at 74. An identical conclusion is appropriate in this case.

## III. CONCLUSION

For the reasons stated above, Mr. Ligurotis' objections to the Independent Administrator's decision are DENIED. The decision of the Independent Administrator is AFFIRMED IN ITS ENTIRETY. In addition, the stay of penalties imposed by the Independent Administrator is dissolved, effective immediately.

SO ORDERED.