UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION CXVII OF the INDEPENDENT ADMINISTRATOR.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

Nov. 30, 1993.

Charles M. Carberry, Investigations Officer of Intern. Broth. of Teamsters (Marla S. K. Gale, Celia A. Zahner, of counsel), Mary Jo White, U.S. Atty., S.D.N.Y. (Steven C. Bennett, Asst. U.S. Atty., of counsel), for U.S.

Yelsky & Lonardo Co., L.P.A., Cleveland, OH (Leonard W. Yelsky, Angelo F. Lonardo, of counsel), for respondent Harold Friedman.

Berkman, Gordon, Murray, Palda & De-Van, Cleveland, OH (Brooke F. Kocab, J. Michael Murray, Jeremy A. Rosenbaum, of counsel), for respondents Gerald Yontek, William Jurevicius, Barbara Walden, Paul LaBuda, Ed Thomas, John Letner, Daniel Kolar, Douglas Schuetz, Stephen Kapelka, Philip Lukic, and Rudy Nativio.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America (the "Government") against defendants International Brotherhood of Teamsters (the "IBT" or the "Union") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer who supervised the electoral process that culminated in the 1991 election for International Officers. The goal of the Consent Decree is to rid the IBT of the influence of organized crime through the election and disciplinary provisions.

Application CXVII presents for this Court's review the decision of the Independent Administrator regarding disciplinary charges brought by the Investigations Officer against Harold Friedman ("Friedman"), former president of IBT Local 507 in Cleveland, Ohio, and against officers and agents of IBT Local 507 including Gerald Yontek, William Jurevicius, Barbara Walden, Paul LaBuda, Ed Thomas, John Letner, Daniel Kolar, Douglas Schuetz, Stephen R. Kapelka, Philip

Lukic, and Rudy Anthony Nativio ("respondent officers and agents"). The Investigations Officer charged Friedman with violating the IBT Constitution by violating the terms of his one-year suspension from any officer or trusteeship position with the IBT or any IBT-affiliated entity, and violating 29 U.S.C. § 504, which bars Friedman from advising or acting as consultant to any labor organization as a result of his 1989 criminal conviction. The Investigations Officer charged respondent officers and agents with violating the IBT Constitution by facilitating Friedman's ongoing imposition of influence and control over IBT Local 507 in violation of his suspension and of 29 U.S.C. § 504. The Independent Administrator found that respondent Friedman had violated his one-year suspension as well as his statutory debarment. The Independent Administrator also found that respondent officers and agents acquiesced to, and in some instances actively assisted, Friedman's improper involvement in IBT Local 507.

For these violations, the Independent Administrator permanently barred Friedman from membership in the IBT. Furthermore, the Independent Administrator ordered that the IBT and IBT-affiliated persons and entities not make contributions to employee benefit plans on Friedman's behalf, regardless of whether such plans are under the exclusive control of the IBT. Consistent with prior rulings in this case, see, e.g., June 10, 1993 Memorandum & Order, 824 F.Supp. 406, 409 n. 3 (S.D.N.Y.1993), the Independent Administrator did not alienate Friedman's vested benefits. The Independent Administrator barred respondent officers and agents from holding or drawing compensation from any IBT-affiliated officer or trusteeship position for terms varying in accordance with each individual's culpability. The Independent Administrator directed that contributions by the IBT or any IBT-affiliated entities to the employee benefit plans of each of these individuals attributable to his or her position as an officer or agent cease during his or her period of suspension. Finally, the Independent Administrator ruled that respondents are not entitled to have any of their legal

expenses paid by the IBT or any IBT-affiliated entity. The Independent Administrator stayed the imposition of penalties pending this Court's review.

Respondents contend that the Independent Administrator's decision is arbitrary and capricious, an abuse of discretion, contrary to law, and unsupported by the evidence. These arguments are without merit. The decision of the Independent Administrator is both legally sound and well supported by the evidence. Accordingly, the decision of the Independent Administrator is affirmed in all respects.

## I. BACKGROUND: INDEPENDENT ADMINISTRATOR'S FINDINGS

The Investigations Officer charged that, while suspended from all officer and trusteeship positions in IBT Local 507, respondent Friedman brought reproach upon the IBT, interfered with and induced others to interfere with the performance of the Union's legal obligations, and violated his membership oath, in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2), and (5) of the IBT Constitution. The Investigations Officer further charged that respondent officers and agents brought reproach upon the IBT, interfered with and allowed others to interfere with the performance of the Union's legal obligations, and violated their membership oaths, in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2) and (5) of the IBT Constitution. Article II, Section 2(a), the IBT membership oath, provides in relevant part that every IBT member shall "conduct himself or herself at all times in such a manner as not to bring reproach upon the Union." Article XIX, Section 7(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. The three specific Section 7(b) charges brought against respondents are: (1) violating the IBT Constitution, a Local Union Bylaw or other Union rule; (2) violating the IBT membership oath; and (3) engaging in conduct that is disruptive of, interferes with, or induces others to disrupt or interfere with, the performance of any Union's legal or contractual obligations. See IBT Const., Art. XIX, § 7(b)(1), (2), and (5).

Pursuant to Section F.12(c) of the Consent Decree, the Independent Administrator must adjudicate disciplinary charges using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After conducting a hearing (the "hearing") at which respondents were represented by counsel, and after receiving post-hearing submissions, the Independent Administrator issued a thirty-six page decision. The Independent Administrator found that the Investigations Officer had satisfied his burden of proving that Friedman brought reproach upon the Union by continuing to interject himself in the affairs of IBT Local 507, playing a significant role in the running of IBT Local 507, and holding himself out as a figure of continuing authority, in violation of his suspension and his statutory bar from union activity. (Decision of the Independent Administrator ("Ind.Admin.Dec.") at 2). The Independent Administrator also found that the Investigations Officer had satisfied his burden of proving that respondent officers and agents brought reproach upon the Union by permitting Friedman to interject himself in the affairs of IBT Local 507. (Ind.Admin.Dec. at 2).

### A. Respondent Friedman's Violation of his One–Year Suspension

In an earlier action, Harold Friedman ("Friedman"), president of IBT Local 507 and president of Bakery, Confectionery and Tobacco Workers International Union, Local 19 ("Bakers Local 19") in Cleveland, Ohio, was charged by the Investigations Officer with bringing reproach upon the IBT by: (1) embezzling funds from Bakers Local 19 in 1981 while he was the president of that Local; (2) conspiring to and engaging in racketeering activity in connection with Bakers Local 19; and (3) filing a false form LM–2 with the Department of Labor on behalf of Bakers Local 19. On January 11, 1990, the Independent Administrator ordered Harold Friedman "to remove [himself] from all of [his] IBT affiliated Union positions and draw no money or compensation therefrom, or from any other IBT affiliated source," for a

period of one year. This Court affirmed the Independent Administrator's ruling, at which time the one-year suspension commenced. March 8, 1990 Opinion & Order, 735 F.Supp. 506 (S.D.N.Y.), aff'd, 905 F.2d 610 (2d Cir. 1990). Although Friedman was prohibited by the Independent Administrator's ruling from assuming any officer or trusteeship position within IBT Local 507, he was permitted to retain his IBT membership. Because of the Consent Decree's limited application, Friedman retained his position as president of Bakers Local 19.

In addition, Friedman's conduct as president of Bakers Local 19 resulted in his criminal conviction in 1989 in the United States District Court for the Northern District of Ohio. United States v. Friedman, 86 Cr. 114 (N.D.Oh.1989). As a result of that conviction, Friedman was prohibited from acting as a consultant or advisor to any labor organization for a period of three years beginning on January 3, 1991, pursuant to 29 U.S.C. § 504. This prohibition applies to Friedman's status in IBT Local 507 as well as in Bakers Local 19.

In the current action, the Investigations Officer charged that Friedman continued to exert substantial influence and control over IBT Local 507 during the period of his suspension, as well as subsequent to the commencement of his three-year statutory bar from union activities under 29 U.S.C. § 504. The Investigations Officer identified several instances when Friedman sought to maintain influence and control over IBT Local 507, or to derive benefits as an officer or trustee, in spite of his one-year suspension and his three-year statutory bar.

The Independent Administrator found that, although Friedman relinquished his formal title to all IBT-affiliated positions, he continued to play a significant role in running IBT Local 507 after the commencement of his suspension. Thus, the Independent Administrator concluded that while Friedman had complied with the terms of his suspension in part, he continued to interject himself in the affairs of IBT Local 507 and hold himself out as a figure of continuing authority, in violation of the terms of his suspension. In addition, the Independent Administrator found that Friedman continued to advise IBT Local 507 after the commencement of his three year statutory bar, in violation of 29 U.S.C. § 504. These conclusions were based on the Independent Administrator's findings with regard to the following instances of improper conduct charged by the Investigations Officer.

### 1. Friedman's Involvement in Bakers Local 19

The Independent Administrator found that Friedman used his position as president of Bakers Local 19 to continue to exercise control over IBT Local 507. The Independent Administrator found that these two unions, although separate entities, are "run almost as one." (Ind.Admin.Dec. at 7). They share the same office space and personnel, run many joint events, and share the same executive board, business agents, and president. (Ind.Admin.Dec. at 7). Respondent officers and agents were officers and agents of Bakers Local 19 as well as officers and agents of IBT Local 507. Thus, as president of Bakers Local 19, Friedman was in a position to continue to influence the affairs of IBT Local 507, and the Independent Administrator found that he did so in a number of ways.

The Independent Administrator found that on or about May 1, 1990, the IBT Local 507 Health and Welfare Fund was merged into the Bakers Local 19 Health and Welfare Fund. (Ind.Admin.Dec. at 14–15). Friedman was a trustee of the Bakers Local 19 fund, and acted as chairman of the merged funds. On or about October 3, 1990, the IBT Local 507 Pension Fund was merged into the Bakers Local 19 Pension Fund. The Independent Administrator found that "[t]hrough these mergers, using his position with Bakers Local 19, Friedman was able to retain a certain measure of authority over a significant amount of funds earmarked for IBT Local 507 members' health, welfare, and pension benefits." (Ind.Admin.Dec. at 15).

In addition to retaining authority over IBT Local 507 through his position with Bakers Local 19, the Independent Administrator found that Friedman was able to continue to receive the same overall income from his union activities after his suspension, once

again by way of his position in Bakers Local 19. As a result of his suspension, Friedman forfeited his $175,000 salary as president of IBT Local 507. However, Friedman's salary as president of Bakers Local 19 was increased from approximately $271,000 before his suspension to approximately $504,000 after his suspension. The Independent Administrator found that this increase was designed to replace Friedman's loss of compensation as IBT Local 507 President. (Ind.Admin.Dec. at 15).[1]

Friedman also participated in and spoke at a number of IBT Local 507 meetings in his capacity as president of Bakers Local 19. The Independent Administrator found that Friedman used his position in Bakers Local 19 at these meetings as a means of circumventing his one-year suspension, as discussed below.

### 2. Friedman's Attendance at IBT Local 507 Meetings

The Independent Administrator found that Friedman's attendance at a contract ratification meeting on October 27, 1990 was for the purpose of influencing the vote by the membership of IBT Local 507 on a contract with Riser Foods, an IBT employer. (Ind.Admin.Dec. at 11–13). This meeting occurred during Friedman's suspension from IBT Local 507, but before he was barred from his presidency of Bakers Local 19 as a result of his criminal conviction. The Independent Administrator noted that either Friedman or respondent Nativio ordered the court reporter transcribing the meeting to remove Friedman's comments from the record, and determined that this was an effort to cover up Friedman's improper participation in the meeting. (Ind.Admin.Dec. at 13 n. 6). Friedman argues that his comments concerning ratification of the Riser Foods contract had no effect upon the contract's ultimate acceptance by IBT Local 507, and that he had a legitimate reason for speaking at the meeting in his capacity as president of Bakers Local 19.

The Independent Administrator rejected these arguments, stating that "[r]egardless of whether Friedman's comments affected the outcome of the vote for the Riser Foods contract, the fact remains that Friedman attempted to influence that vote." (Ind.Admin.Dec. at 12). Furthermore, the Independent Administrator found that "Friedman's endorsement of the Riser Foods contract is a clear example of his holding himself out as someone who was still a figure of authority within the IBT." (Ind.Admin.Dec. at 12). Friedman asserts that he prefaced his remarks at the meeting by reminding the membership that he was speaking only in his capacity as president of Bakers Local 19. The Independent Administrator found that, even if true, such a preface was insufficient to legitimate Friedman's actions. (Ind.Admin.Dec. at 13 (footnote omitted)) ("Such words, even if they were spoken, were not, however, a talisman that magically transformed Friedman's comments into those that were non-violative of his suspension. To say that they were would allow a person suspended from the IBT to speak to the membership with a wink and a nod as an interested outsider, while still retaining influence over the Union. This is not permitted.").

Friedman also attended a general membership meeting on April 14, 1990, shortly after his suspension went into effect. The Independent Administrator rejected the notion that Friedman appeared at this meeting solely in his capacity as president of Bakers Local 19, noting that respondent Nativio, who chaired the meeting, admitted at the hearing that the meeting was called to order "in the name of Teamsters Local No. 507," and that most if not all of the people in attendance at the meeting were IBT Local 507 members. Furthermore, respondent Letner stated at the hearing that IBT Local 507 and Bakers Local 19 did not hold joint meetings. (Ind.Admin.Dec. at 13 n. 7). At the meeting, respondent Nativio, acting as chair, encouraged IBT members to get together with Friedman on a Saturday, urging them to "come down on a Saturday with all

---

1. Since these particular instances occurred prior to the commencement on January 3, 1991 of Friedman's statutory bar from union activity pursuant to 29 U.S.C. § 504, they constitute a violation of Friedman's suspension, but not a violation of his statutory bar, the terms of which removed Friedman from presidency of Bakers Local 19.

your Business Agents, Harold [Friedman] and [his wife, Respondent] Barbara [Walden] and everybody together, and make sure that your company knows that you are sticking together. That is good." (Ind.Admin.Dec. at 14). The Independent Administrator found that Friedman's attendance at this meeting and Nativio's remarks were intended to convey the message that Friedman continued to be involved in the running of IBT Local 507. (Ind.Admin.Dec. at 13–14).

### 3. Friedman's Participation in IBT Local 507 Social Events

The Independent Administrator found that Friedman continued during his suspension to use regular dinner meetings with respondent officers and agents as an opportunity to discuss IBT Local 507 business. Prior to Friedman's suspension, these dinners were a common occurrence at which respondents discussed IBT Local 507 affairs at the end of the day; the Independent Administrator rejected respondents' contention that after Friedman's suspension, these dinners became purely social occasions at which no business was discussed. (Ind.Admin.Dec. at 16). Instead, the Independent Administrator concluded that these dinners were "a perfect opportunity for Friedman to discuss Union business with small groups of officers and agents, without the worry of having a record being made of the conversations." (Ind.Admin.Dec. at 16). The Independent Administrator concluded further that after January 3, 1991, these dinners also constituted a violation of Friedman's statutory bar pursuant to 29 U.S.C. § 504, which prohibits Friedman from advising or acting as consultant to any union.

The Independent Administrator also found that Friedman attended and spoke at several joint IBT Local 507 and Bakers Local 19 Christmas parties and blood bank drives. (Ind.Admin.Dec. at 17–18). Respondent Yontek distributed fliers that displayed numerous pictures of Friedman at these events. By way of these fliers, "the appearance was given that Friedman was very much the lone figure of authority at both IBT Local 507 and Bakers Local 19." (Ind.Admin.Dec. at 18 n. 10). The Independent Administrator found

that, although Friedman was not prohibited from attending these events, his presence in a place of prominence at the meetings combined with the images of Friedman portrayed in Yontek's fliers conveyed the impression that Friedman remained the unofficial leader of IBT Local 507. The Independent Administrator noted that Friedman's presence at these meetings taken alone might not constitute a violation of his suspension, but that in the context of his other violations discussed above, Friedman's presence at these events was part of a pattern of behavior designed to create the overall impression that his suspension was not really in effect on a practical level and that he retained significant authority over IBT Local 507.

### B. Respondent Friedman's violation of 29 U.S.C. § 504

Beginning on January 3, 1991, Friedman was barred for three years, pursuant to 29 U.S.C. § 504, from acting as advisor or consultant to any labor organization as a result of his criminal conviction in 1989. (Ind.Admin.Dec. at 6–7). The Independent Administrator found that Friedman violated this bar by using regular dinner meetings with respondent officers and agents as an opportunity to discuss the affairs of IBT Local 507 and Bakers Local 19. (Ind.Admin.Dec. at 21). As discussed above, the Independent Administrator found that those dinners occurring during Friedman's one-year suspension were in violation of that suspension. (Ind.Admin.Dec. at 15–17). The Independent Administrator found that the dinner meetings that occurred after January 3, 1993 also violated Friedman's three-year bar from acting as consultant or advisor to any labor organization. (Ind.Admin.Dec. at 21).

The Independent Administrator also found that Friedman gave IBT Local 507 officers and agents a number of "pep talks" concerning Union activities after the commencement of his statutory bar, and found that these talks violated 29 U.S.C. § 504. (Ind.Admin.Dec. at 20–21). The purpose of these talks apparently was to provide advice and encouragement to the officers and agents of IBT Local 507 and Bakers Local 19 after Friedman had forfeited his positions with

both unions. (Ind.Admin.Dec. at 20–21). On another occasion, Friedman discouraged members of IBT Local 507 from attempting to run for a position with the International Union. (Ind.Admin.Dec. at 20–21). The Independent Administrator found that these talks constituted advice to a labor organization, and therefore violated the terms of Friedman's debarment pursuant to 29 U.S.C. § 504. Since the precise dates of these talks appear to be uncertain, the Independent Administrator also noted that to the extent that these talks occurred during Friedman's one-year suspension, they also violated that suspension. (Ind.Admin.Dec. at 21 n. 16).

### C. Respondent Friedman's Violation of the IBT Constitution

The Independent Administrator ruled that Friedman's violations of his one-year suspension and his statutory bar pursuant to 29 U.S.C. § 504 brought reproach upon the IBT under Article II, Section 2(a) of the IBT Constitution. (Ind.Admin.Dec. at 22). The Independent Administrator ruled further that, since the IBT has a legal obligation to ensure that suspensions imposed pursuant to the Consent Decree are carried out completely, properly, and fully, and that all statutory debarments are entirely implemented, Friedman's conduct was disruptive of the performance of the IBT's legal obligations and therefore violated Article XIX, Section 7(b)(5) of the IBT Constitution. (Ind.Admin.Dec. at 22).

### D. Respondent Officers' and Agents' Violations

The Independent Administrator found that respondent officers and agents failed to take any steps to prevent Friedman's violation of his one-year suspension, and in some cases actively assisted that violation. (Ind.Admin.Dec. at 23). Furthermore, the Independent Administrator found that respondent officers' and agents' acquiescence in the face of Friedman's violation of his statutory bar constituted a violation of their duties as officers and agents of the IBT. (Ind.Admin.Dec. at 25). In arriving at these findings, the Independent Administrator observed that "It is the duty of all IBT officials

to take every reasonable step to prevent a suspended or barred individual from violating this standard. This duty is an affirmative one; acquiescence in the face of a violation of a suspension order or a statutory debarment is a violation of that duty." (Ind.Admin.Dec. at 23).

In addition, the Independent Administrator found that in failing to prevent, and in some cases assisting, Friedman's violation of his one-year suspension, and in acquiescing to Friedman's violation of his three-year statutory bar, respondent officers and agents brought reproach upon the IBT under Article II, Section 2(a) of the IBT Constitution. (Ind.Admin.Dec. at 25). The Independent Administrator also found that respondent officers and agents disrupted the performance of the IBT's legal obligation to carry out suspensions imposed pursuant to the Consent Decree completely, properly, and fully, and to prevent any person subject to debarment under 29 U.S.C. § 504 from acting as advisor or consultant to the IBT. Hence, respondent officers and agents violated Article XIX, Section 7(b)(5) of the IBT Constitution. (Ind.Admin.Dec. at 25–26).

The Independent Administrator noted, however, that although all respondent officers and agents had violated their duties, some were more culpable than others. (Ind.Admin.Dec. at 27). This is reflected in the respective penalties imposed on them.

### II. DISCUSSION

#### A. The Independent Administrator's Decision Is Amply Supported by the Evidence

Respondents argue that the Independent Administrator's decision is arbitrary and capricious, an abuse of discretion, contrary to law, and unsupported by the evidence. Specifically, respondents assert that Friedman's activities during his one-year suspension and after the commencement of his three-year statutory bar constituted a legitimate exercise of his rights as an IBT member, and are protected by the First Amendment of the United States Constitution and 29 U.S.C. § 411. Respondents contest the Independent Administrator's inferences regarding

Friedman's participation in various IBT meetings and events, and argue that Friedman was not attempting to interject himself in IBT Local 507's activities in violation of his suspension and statutory bar. Furthermore, respondents argue that the officers and business agents charged with permitting Friedman to violate his suspension and statutory bar did not act improperly.

■ In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir. 1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* August 11, 1993 Opinion & Order, 829 F.Supp. 608, 616–17 (S.D.N.Y.1993); July 13, 1993 Opinion & Order, 826 F.Supp. 749, 755–56 (S.D.N.Y.1993); June 22, 1993 Opinion & Order, 824 F.Supp. 410, 413–14 (S.D.N.Y. 1993); June 10, 1993 Memorandum & Order, 824 F.Supp. 406, 409 (S.D.N.Y.1993); March 5, 1993 Opinion & Order, 817 F.Supp. 337, 341–42 (S.D.N.Y.1993); February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1175–76 (S.D.N.Y.1993); December 10, 1992 Opinion & Order, 808 F.Supp. 279, 281 (S.D.N.Y. 1992), *aff'd*, 998 F.2d 120 (2d Cir.1993); July 14, 1992 Opinion & Order, 803 F.Supp. 748, 754 (S.D.N.Y.1992); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 745–46 (S.D.N.Y. 1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1352 (S.D.N.Y.), *aff'd*, 981 F.2d 1362 (2d Cir. 1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip op.*, at 4–5, 1991 WL 243292 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991 Order, *slip op.*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip op.*, at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip op.*, at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip op.*, at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, *slip op.*, at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd*, 907 F.2d 277 (2d Cir.1990).

■ At the heart of the Independent Administrator's ruling is the finding that respondent Friedman complied with his one-year suspension and his three-year statutory bar by way of a sham appearance; in reality, he continued to exert influence and authority over IBT Local 507 by means of informal meetings and social events and through his

position as president of Bakers Local 19, an organization so intimately intertwined with IBT Local 507 that the two are in many respects the same organization. I find nothing arbitrary or capricious about this finding, and I conclude that the Independent Administrator's ruling is firmly grounded in a reasonable and prudent analysis of the evidence. Furthermore, I find that respondents' commentary on the evidence, as well as their attempt to shield Friedman's activities under the rubric of the First Amendment and 29 U.S.C. § 411, are premised on a naive and fundamentally inaccurate perception of respondent Friedman's activities. I do not accept respondents' analysis of the evidence, and I find that their legal contentions are without merit.

### 1. Respondent Friedman's Violation of his Suspension

In his decision, the Independent Administrator observed that, in order for a suspension from the IBT to have any effect whatsoever, "Union power must be relinquished through all channels-*de jure* and *de facto*; legitimate and illegitimate; denotative and connotative." (Ind.Admin.Dec. at 9–10). Indeed, a suspension that requires a Union official to relinquish his formal title, but allows him to continue to direct the Union as its *de facto* leader though he retains only his membership in the Union would do little to enforce the terms of the Consent Decree and uphold the provisions of the IBT Constitution. The suspended official might be somewhat hampered in his exercise of authority by virtue of the loss of his title, but in the context of the tightly knit social fabric of IBT Local 507, he would find at his disposal a convenient array of methods and avenues by which to continue to direct the affairs of the Union. This is not the nature of the suspension imposed on respondent Friedman, nor does it in any sense represent the yardstick by which to measure Friedman's adherence to his one-year suspension.

Suspension is one of the most useful penalty options available under the Consent Decree. Properly enforced, it allows the removal of individuals from officer or trusteeship positions in the Union where they may

be disserving the membership and undermining the IBT Constitution and, indeed, the Union itself. The availability of suspension as a sanction in IBT disciplinary matters lends to the Consent Decree credibility and respect, and sends to the membership the message that its union is under the direction of honest officials that respect the IBT Constitution. By contrast, the suspension that is enforced only in form undermines the Consent Decree and sends the message to the membership that dishonest IBT officials are immune from the law. Moreover, the spectacle of a suspension that has become a caricature of itself deflates the morale and dampens the zeal of those who attempt to live within the law and work within the rules.

■■■ The suspended IBT official must approach his suspension with a grave sense of respect. He must accept its provisions not only in form but also in substance and spirit. Those around him must share this sense of respect and do everything within their power to see that the suspension is truly effectuated. Indeed, a suspension is not a matter of concern solely to the suspended individual, but also to the IBT community around him. Thus, when an IBT member is suspended from holding any officer or trusteeship position with the Union, but is permitted to retain his membership in the IBT, the suspended individual is afforded the opportunity to remain a member of the IBT in return for the covenant that he and his IBT community will scrupulously abide by the terms of the suspension. A violation of the suspension is a breach of this covenant, and merits the imposition of a more serious penalty.

The Independent Administrator found that respondent Friedman used his position as president of Bakers Local 19 to continue to influence the affairs of IBT Local 507. It is clear that these two organizations, though different in name, are in many ways operated as a single entity. Prior to his one-year suspension, Friedman was president of both locals, and respondent officers and agents were all officers and agents of both locals. The locals share the same office space, personnel, executive board, officers, and business agents. Thus, as president of Bakers Local 19, Friedman continued to act as presi-

dent of an organization that was almost identical to the one from which he was suspended. The Independent Administrator found that Friedman took advantage of the opportunities this presented. He acted as chairman of the merged IBT Local 507 and Bakers Local 19 health and welfare funds, and presided over the two locals' merged pension funds, thereby retaining authority over a significant amount of funds earmarked for IBT Local 507 members' health, welfare, and pension benefits. He recouped his forfeited salary as president of IBT Local 507 by means of a near doubling of his salary as president of Bakers Local 19. I find the Independent Administrator's findings and conclusions regarding these activities to be reasonable and amply supported by the evidence.

The Independent Administrator found that Friedman's attendance at a contract ratification meeting on October 27, 1990 was for the purpose of influencing the vote by the membership of IBT Local 507 on a contract with Riser Foods, an IBT employer. The Independent Administrator also found that either Friedman or respondent Nativio ordered that Friedman's remarks be removed from the record. The Independent Administrator found that Friedman had sought to influence a particular item of IBT business and had held himself out as a figure of continuing authority within the IBT, and determined that Friedman's remarks were removed from the record in order to eliminate any permanent evidence of these activities. The Independent Administrator's findings in this regard are neither arbitrary nor capricious. Rather, the Independent Arbitrator's findings are fully supported by the evidence. Friedman's contention that he prefaced his remarks by stating that he was speaking solely in his capacity as president of Bakers Local 19, and that his remarks had no effect upon the contract's ultimate acceptance by IBT Local 507, is unconvincing. Friedman's casual disclaimer did not free him from the terms of his suspension. Regardless of the ultimate effect of these remarks, I find that they constituted an attempt to influence the IBT Local 507's vote. Accordingly, this action constituted a violation of the terms of Friedman's suspension.

Friedman also attended a general membership meeting on April 14, 1990. Friedman once again contends that he appeared at this meeting solely in his capacity as president of Bakers Local 19. As the Independent Administrator properly noted, however, this meeting was called to order "in the name of Teamsters Local No. 507," and IBT Local 507 and Bakers Local 19 did not hold joint meetings. At this meeting, which occurred shortly after Friedman's one-year suspension went into effect, respondent Nativio, chair of the meeting, encouraged IBT members to get together on a Saturday with Friedman and his wife, respondent Walden, and "make sure that your company knows that you are sticking together." (Ind.Admin.Dec. at 14). The Independent Administrator found that Friedman's attendance at this meeting and Nativio's remarks were intended to convey to the membership the message that Friedman continued to be involved in the running of IBT Local 507. I find that the Independent Administrator's findings with regard to this meeting are both reasonable and supported by the evidence.

The Independent Administrator found that Friedman continued during his suspension to convene regular dinner meetings with respondent officers and agents, and used these dinners as an opportunity to discuss IBT Local 507 business. I find the Independent Administrator's determination that IBT Local 507 business was discussed during these dinners to be logical and supported by the record. Prior to his suspension, Friedman routinely used these dinners to review IBT Local 507 affairs. The Independent Administrator did not find credible respondents' claim that subsequent to Friedman's suspension, IBT Local 507 business was no longer discussed, and that subsequent to the commencement of Friedman's statutory bar no Union business whatsoever was discussed. Nor do I, and therefore I affirm the Independent Administrator's findings regarding these dinner meetings.

The Independent Administrator also found that Friedman attended and spoke at a number of joint IBT Local 507 and Bakers Local 19 Christmas parties and blood bank drives. Mere attendance at these social events was

not prohibited by Friedman's one-year suspension. However, respondent Yontek later distributed fliers that displayed numerous pictures of Friedman at these events, and also contained copies of 25 letters of appreciation sent by Union members and addressed specifically to Friedman. Yontek described these fliers as his "personal little tribute to [Friedman]." (Ind.Admin.Dec. at 17 & n. 10). The Independent Administrator found that these fliers were intended to portray the image of Friedman as the lone figure of authority at both IBT Local 507 and Bakers Local 19. The Independent Administrator found that although Friedman's presence at these events in and of itself might not constitute a violation of his suspension, his position of prominence at the events combined with the image of Friedman portrayed in Yontek's fliers was part of a broader pattern of holding himself out as a figure of authority at IBT Local 507, and communicating to the IBT Local 507 membership the sense that his suspension was not really in effect on a practical level. I find that there is ample evidence of such a pattern of activity, and that the Independent Administrator reasonably concluded that the nature of Friedman's presence at these social events and the character of the fliers were a further manifestation of this pattern.

As Machiavelli explained several centuries ago, power may be wielded in subtle, deceptive, and devious ways. What we see on the surface is often a veil for the true forces at work underneath. From a careful review of the evidence, the Independent Administrator found a sometimes subtle but definite pattern of activity on the part of Friedman and respondent officers and agents designed to circumvent the terms of Friedman's one-year suspension and maintain in him a significant measure of his former powers as president of IBT Local 507. As this Court previously has stated, "[T]he Independent Administrator has the authority to find that a pattern of conduct constitutes a violation of the IBT Constitution, even if no single element of the pattern itself is a violation." February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1181 (S.D.N.Y.1993). The Independent Administrator weighed the evidence, made reasonable inferences based on the evidence ad-duced before him regarding the significance of certain facts and events, and found that Friedman had engaged in a pattern of activity specifically designed to circumvent the terms of his one-year suspension. I find the Independent Administrator's decision not only reasonable, but compelling. Friedman spoke at IBT Local 507 meetings, continued to direct IBT Local 507 affairs at regular dinner meetings with respondent officers and agents, presided over IBT Local 507 health, welfare, and pension funds, maintained the same income level from his union positions as before his suspension, and comported himself as the lone figure of authority at IBT Local 507 at social events, all during the period in which he had supposedly removed himself from all officer and trusteeship positions with IBT Local 507. It is clear that respondent Friedman violated his one-year suspension. Accordingly, I affirm the Independent Administrator's finding that respondent Friedman violated his suspension.

#### i. Respondents' First Amendment Argument

Respondents argue that Friedman's conduct was protected by the freedom of speech and freedom of association provisions of the First Amendment of the U.S. Constitution. Respondents correctly observe that the Independent Administrator's original decision did not strip Friedman of his IBT membership, and contend that the conduct that formed the basis of the charges against Friedman falls within the ambit of his constitutionally protected rights of speech and association as an IBT member. This argument is without merit.

Since the United States Constitution regulates only the Government, not private parties, in order to claim that the Independent Administrator's ruling violates Friedman's First Amendment rights, respondents must first establish that the Independent Administrator's ruling constitutes "state action." See, e.g., Blum v. Yaretsky, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982); Rendell–Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). It is well settled, however, that the Independent Administrator, acting within his

authority to impose sanctions upon violators of the IBT Constitution, is not a state' actor. *See United States v. IBT*, 941 F.2d 1292, 1295–96 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); *see also United States v. IBT*, 981 F.2d 1362, 1371 (2d Cir.1992), *aff'g* May 15, 1992 Opinion & Order, 792 F.Supp. 1346 (S.D.N.Y. 1992); *United States v. IBT*, 954 F.2d 801, 806–07 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); June 22, 1993 Opinion & Order, 824 F.Supp. 410, 417 (S.D.N.Y.1993), February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1171 (S.D.N.Y. 1993); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992). Moreover, even if the Independent Administrator were a state actor, his decision would not violate Friedman's First Amendment rights. Clearly, Friedman was not free to speak or associate in a manner that violated his one-year suspension and his statutory debarment any more than he was free to embezzle funds or engage in racketeering activity, the types of conduct that resulted in his suspension and debarment in the first place. Nothing in the First Amendment releases Friedman from the terms of his suspension or his statutory debarment, and to the extent that Friedman's words and patterns of association were more restricted than those of his fellow IBT members, such restrictions were an inherent aspect of his suspension and his debarment and can hardly be cast as a violation of his constitutional rights. Friedman's contention that his conduct was merely that of an IBT member exercising in good faith his constitutionally protected right to speak and to associate is disingenuous. Accordingly, I find that respondents' First Amendment argument is without merit.

### ii. Respondents' 29 U.S.C. § 411 Argument

■ Respondents also contend that Friedman's activities were protected by 29 U.S.C. § 411. This argument is similarly unavailing. Section 411(a)(2) provides that "Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting ... *Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.*" 29 U.S.C. § 411(a)(2) (1990) (emphasis added). While Section 411(a)(2) confers broad rights of expression and association upon IBT members, it also makes clear that these rights should not be "construed to impair" the ability of the Independent Administrator, acting within the disciplinary authority vested in him by Paragraph 12(A) of the Consent Decree, to punish IBT members that violate the "reasonable rules" of the IBT Constitution. As this Court has stated previously, "the IBT's sanctioning members in order to rid itself of corrupt influence conforms with [29 U.S.C. § 411(a)(2) ], and infringes no First Amendment rights." August 27, 1990 Order & Opinion, 745 F.Supp. 908, 913 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). Furthermore, I affirm the Independent Administrator's finding that respondent Friedman went far beyond the limits of his permissible activities as an IBT member, and I reject the notion that such a finding violates Friedman's rights under Section 411(a)(2). Accordingly, respondents' 29 U.S.C. § 411 argument is without merit.

### 2. Respondent Friedman's Violation of his Three–Year Statutory Bar Pursuant to 29 U.S.C. § 504

■ After January 3, 1991, respondent Friedman was prohibited from acting as an advisor or consultant to any union, pursuant to 29 U.S.C. § 504. The Independent Administrator found that in spite of this statutory bar, Friedman gave IBT Local 507 officers and agents several "pep talks" concerning Union affairs after January 3, 1991, and that these talks violated the terms of 29 U.S.C. § 504. This finding is not arbitrary or capricious and is well supported by the

evidence before this Court. The Independent Administrator found that some of the talks were intended to provide advice and encouragement to the officers and agents of IBT Local 507 and Bakers Local 19 following Friedman's relinquishment of his formal title as president of both locals. The purpose of another talk was to discourage members of IBT Local 507 from attempting to run for a position with the International Union. The Independent Administrator found that these talks constituted advice to a labor organization, and therefore violated the terms of 29 U.S.C. § 504. The evidence clearly supports this finding.

In addition, the Independent Administrator found that the regular dinner meetings that occurred after January 3, 1993 constituted a violation of Friedman's three-year statutory bar. As discussed above, the Independent Administrator found that Friedman discussed IBT Local 507 business at these dinners and I find that the record amply supports this finding. Accordingly, I affirm the Independent Administrator's finding that respondent Friedman violated his three-year statutory bar by his conduct in connection with those dinners that occurred after January 3, 1991.

█ Respondents argue that Section 504 does not apply to Friedman because a "consultant or advisor" as comprehended by Section 504(a)(1) includes only individuals who are compensated for specific services including employee organizing, concerted activities, or collective bargaining. Nothing in the statutory language, however, supports this narrow interpretation of the term "consultant or advisor." To the contrary, when the drafters of Section 504 sought to limit the application of a particular provision of the statute to paid individuals, they used the term "labor relations consultant or advisor," *see* 29 U.S.C. § 504(a)(3), and provided a definition of that term making clear that it included only paid individuals, *see* 29 U.S.C. § 402(m). Moreover, the broader, more literal interpretation of "consultant or advisor" is consistent with the purpose of Section 504, namely, to prohibit individuals convicted of certain crimes from holding union office. As the Independent Administrator correctly observed, "To

so limit the statute's application would lead to the absurd result of allowing debarred union officers, like Friedman, to volunteer to run a union organization, without violating the statute." (Ind.Admin.Dec. at 19).

Respondents also contend that even if Section 504(a)(1) incorporates no requirement of remuneration, the statute is inapplicable because Friedman's particular conduct does not constitute service as a "consultant or advisor." Respondents note that, pursuant to Section 504(a)(5) a person debarred under Section 504 retains his membership, and thereby retains his statutorily protected right to assemble with other Union members, to speak freely at meetings, and to express his views, pursuant to 29 U.S.C. Section 411. As discussed above, however, Friedman went far beyond the limits of his permissible activities as an IBT member, and I find respondents' contention that Friedman's conduct was merely that of an IBT member exercising in good faith his right to speak and to associate to be disingenuous. To the contrary, I find that Friedman's conduct was intended to maintain influence and authority over IBT Local 507 consistent with his former position as president of that local. Such conduct is clearly in violation of 29 U.S.C. § 504.

### 3. Respondent Friedman's Violation of the IBT Constitution

█ Because Friedman violated his one-year suspension and his three-year statutory bar, it follows that Friedman violated the IBT Constitution. As a result of Friedman's violations, he brought reproach upon the IBT under Article II, Section 2(a) of the IBT Constitution. It is also clear that Friedman's conduct was disruptive of the performance of the IBT's legal obligations and therefore violated Article XIX, Section 7(b)(5) of the IBT Constitution. The IBT bears the legal obligation to ensure that suspensions imposed pursuant to the Consent Decree are carried out completely, properly, and fully, and that all statutory debarments are entirely implemented; Friedman's conduct was contrary to these obligations. Thus, the Independent Administrator's determination that Friedman violated the IBT Constitution is neither arbi-

trary nor capricious, and is fully supported by the evidence.

### 4. Respondent Officers' and Agents' Violations

 Within the context of the close community of IBT Local 507, an individual would be unable to violate his suspension and his statutory bar absent the acquiescence and indeed the affirmative assistance of the officers and agents of the local. Surrounded by a solid wall of resistance to his efforts, the suspended and barred individual would be unable to exert and project his influence and authority, and would in a very real sense find himself confined by the terms of his suspension and his statutory debarment. Hence, when an individual successfully circumvents the terms of his suspension and his statutory bar, and continues to influence the direction of a local such as IBT Local 507, this illicit pattern of activity often implicates not only the suspended individual but also the officers and agents that involved themselves with that individual.

The Independent Administrator found that respondent officers and agents failed to take any steps to prevent Friedman from violating his suspension and his statutory bar. Instead, they exhibited a pattern of acquiescence in reaction to Friedman's activities, and in some cases affirmatively assisted Friedman's ongoing assertion of authority over IBT Local 507, in direct violation of his one-year suspension and 29 U.S.C. § 504. I find that the Independent Administrator's determination that respondent officers and business agents failed to fulfill their duty to prevent Friedman from violating the terms of his suspension and his statutory debarment is both reasonable and compelling. As the Independent Administrator observed, "This duty is an affirmative one; acquiescence in the face of a violation of a suspension order or a statutory debarment is a violation of that duty." (Ind.Admin.Dec. at 23).

Fulfilling one's duty requires courage and strength of character. When an individual accepts the position of an officer or business agent of the IBT, he accepts the duties and obligations imposed upon him by the IBT Constitution. Indeed, the Independent Administrator found that in failing to fulfill their duties in this regard, respondent officers and agents brought reproach upon the Union under Article II, Section 2(a) of the IBT Constitution, and disrupted the performance of the IBT's legal obligation to carry out suspensions imposed pursuant to the Consent Decree completely, properly, and fully, and to prevent any person subject to debarment under 29 U.S.C. § 504 from acting as advisor or consultant to the IBT, in violation of Article XIX, Section 7(b)(5) of the IBT Constitution. Although some respondents were less culpable than others, as reflected by the penalties imposed upon them, the Independent Administrator found that all respondent officers and agents at a minimum stood by in a spirit of acquiescence as respondent Friedman engaged in a pattern of activity designed to maintain his authority over IBT Local 507 in violation of his suspension and statutory debarment. As the Independent Administrator observed,

> [A]ll of the Respondents could have taken some steps to remedy the situation, but failed to do so. They could have reported the violation to the Independent Administrator or to the Investigations Officer. They could have protested Friedman's continued infiltration into IBT Local 507 affairs. They could have simply refused to meet or speak with Friedman as Friedman continued to inject himself into IBT Local 507 matters. What is more, by continuing to meet and consult with Friedman under the guise of "social contacts," and by sitting idly by as Friedman attended Local 507 functions, the Respondent Officers and Agents indicated their willingness to allow Friedman to retain control, both in fact and in appearance, of IBT Local 507.

(Ind.Admin.Dec. at 24–25). I find that the Independent Administrator's findings with regard to respondent officers and agents are both reasonable and fully supported by the evidence. I therefore affirm these findings.

### B. Respondents' Procedural Arguments

 Respondents contend that the Independent Administrator's decision should be reversed on a number of procedural grounds.

First, respondents argue that the charges brought by the Investigations Officer lacked specificity and therefore violated their due process rights and 29 U.S.C. § 411(a)(5), which provides that "No member of any labor organization may be ... disciplined ... unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." These arguments are without merit. In the separate charges filed against Friedman and against respondent officers and agents, the Investigations Officer indicated which provisions of the IBT Constitution were violated, described in clear terms the nature of the conduct that constituted these violations, and provided specific examples of such conduct. Hence, each charge was a plain, concise statement of the essential facts constituting the offense charged.

▮ Respondents next argue that the Investigations Officer's decision was arbitrary and capricious because the Independent Administrator considered hearsay evidence in reaching his decision. It is well settled, however, that IBT disciplinary proceedings are akin to administrative proceedings, see United States v. IBT, 978 F.2d 68, 72 (2d Cir.1992), in which the "rules governing the admission of evidence ... are considerably more relaxed." Rocker v. Celebrezze, 358 F.2d 119, 122 (2d Cir.1966) (footnote omitted). Hearsay evidence may be admitted in IBT disciplinary proceedings, provided that it is reliable. United States v. IBT, 998 F.2d 120, 124 (2d Cir.1993); see also United States v. IBT, 978 F.2d at 72; United States v. IBT, 941 F.2d 1292, 1298 (2d Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). The Independent Administrator carefully considered only hearsay evidence that was intrinsically reliable in light of the entire record in this disciplinary action. In each instance where hearsay evidence was considered, the reliability of that evidence was demonstrated by parallel evidence and testimony adduced at the hearing. After examining the hearsay evidence considered by the Independent Administrator, I find that the exhibits to which respondents object are reliable because these exhibits "paint a consistent picture of certain details" regarding Friedman's improper involvement in the affairs of IBT Local 507 during his suspension and statutory debarment. Cf. United States v. IBT, 964 F.2d 1308, 1312 (2d Cir.1992). Accordingly, the Independent Administrator's admission of hearsay evidence does not render his decision arbitrary or capricious.

Respondents have peppered their procedural claims with references to claims under the U.S. Constitution. As discussed above, since the Independent Administrator's imposition of sanctions does not constitute state action, see, e.g., United States v. IBT, 941 F.2d at 1295–97, these claims are without merit.

### C. The Penalties Imposed By the Independent Administrator Are Not Arbitrary or Capricious

This Court repeatedly has recognized that, in reviewing decisions of the Independent Administrator, the findings of the Independent Administrator "are entitled to great deference." United States v. IBT, 905 F.2d 610, 616 (2d Cir.1990), aff'g March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, arbitrary or capricious. See, e.g., United States v. IBT, 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), aff'd, 941 F.2d 1292 (2d Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); March 13, 1990 Opinion & Order, 743 F.Supp. at 165.

▮ Further, it is well settled that the Independent Administrator is vested with broad discretion to fix an appropriate penalty once disciplinary charges are proven. See United States v. IBT, 981 F.2d 1362, 1372 (2d Cir.1992) (refusing to overturn Independent Administrator's decision, even though court itself may have imposed a less severe sanction). As the Second Circuit has stated, "The experienced independent administrator—himself a former federal district judge—heard the witnesses and fixed a penalty. On this record there is no basis for finding the penalty chosen by the administra-

tor was either arbitrary or capricious." *United States v. IBT,* 978 F.2d 68, 74 (2d Cir.1992). Because he conducts the disciplinary hearings, the Independent Administrator is best equipped to evaluate the demeanor, credibility and, ultimately, the culpability, of those who appear before him. *See* February 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1185 (S.D.N.Y.1993). It follows that he also is best situated to determine and fix the penalty to be imposed upon IBT members who violate the Consent Decree's disciplinary provisions. *See United States v. IBT,* 978 F.2d at 73–74. In doing so, he is entitled to great deference. *See United States v. IBT,* 981 F.2d at 1372; *United States v. IBT,* 978 F.2d at 73–74.

An example of the Independent Administrator's great discretion in determining an appropriate penalty is found in *United States v. IBT ("Sansone"),* 981 F.2d 1362, 1371–2 (2d Cir.1992). In *Sansone,* the Second Circuit refused to overturn the Independent Administrator's decision to permanently bar the President of IBT Local 682, Robert S. Sansone, from holding Union office, even though the Court of Appeals indicated that it might have reached a different result. *See id.* at 1372. As the Second Circuit stated, "the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily or capriciously." *Id.*

I find that the suspensions imposed on respondent officers and agents were based on a thoughtful review of the degree of culpability of each individual, and are in no way arbitrary or capricious.

### 1. *Penalties Imposed on Respondent Friedman*

▇▇▇ The Independent Administrator permanently barred Friedman from all IBT-affiliated union positions, including membership in the IBT, and prohibited him from receiving compensation from the IBT or from any other IBT-affiliated source. (Ind.Admin.Dec. at 27). Furthermore, the IBT and IBT-affiliated persons and entities are prohibited from making contributions to employee benefit plans on Friedman's behalf, re-gardless of whether or not such plans are under the exclusive control of the IBT. The Independent Administrator's ruling does not, however, affect Friedman's right to receive any benefits that may have already vested in such plans. (Ind.Admin.Dec. at 27). Finally, the Independent Administrator prohibited the IBT or any IBT-affiliated entity from reimbursing Friedman for any legal expenses incurred in connection with this disciplinary action.

The Independent Administrator found that respondent Friedman violated both his one-year suspension and his three-year statutory bar, and brought reproach upon the IBT and disrupted the performance of the IBT's legal obligations in violation of the IBT Constitution. In discussing the penalties to be imposed on Friedman, the Independent Administrator noted that this was the second instance in which Friedman brought reproach upon the IBT, and recalled that Friedman's one-year suspension, a relatively light penalty, had reflected considerations of Friedman's contributions to the welfare of his union and his community. The Independent Administrator noted further that "This time, however, Friedman is not entitled to any such consideration." (Ind.Admin.Dec. at 26).

By violating the terms of his suspension, Friedman undermined the very means by which the Independent Administrator enforces the Consent Decree. Similarly, his disregard for his three-year statutory bar challenged the ability of the courts to enforce the provisions of 29 U.S.C. § 504. His actions represented a methodical attempt to bypass the obligations placed upon him by the IBT Constitution, and a cavalier disregard for the seriousness of his original sanction. As a former president of IBT Local 507 and a figure of prominence within his local union community, Friedman, through his various violations, communicated a devastating message to the IBT Local 507 membership—that disciplinary sanctions imposed pursuant to the Consent Decree may be disregarded when they conflict with the personal ambitions of a Union officer. Such a message corrodes the morale and the zeal of those members of the IBT that attempt to live within the law and work within the rules.

This message is wrong and will not be countenanced by this Court.

In light of these and other considerations, the Independent Administrator concluded that "suspension orders must be vigorously enforced, lest the penalties imposed become meaningless exercises in futility; and once the penalties are rendered meaningless so, too, will a violation of the rules become meaningless. As such, it is necessary that an individual's violation of his suspension be met with substantial penalties." (Ind.Admin.Dec. at 27). The Independent Administrator permanently barred Friedman from membership in the IBT. I find that this penalty is neither arbitrary nor capricious; to the contrary, it is an entirely appropriate penalty for one who has brazenly spurned the opportunity to mend his ways. Furthermore, I find that the Independent Administrator's ruling with regard to Friedman's employee benefits and legal fees is appropriate in light of the record before this Court. Accordingly, I affirm the penalties imposed on respondent Friedman in all respects.

### 2. Penalties Imposed on Respondent Officers and Agents

The Independent Administrator found that respondent officers and agents failed to ensure that Friedman's one-year suspension and three-year statutory bar were vigorously enforced, noting that "[a]s a practical matter, this is of greater importance than the suspended individual himself obeying his suspension or debarment, because such an individual cannot violate his suspension if he does not have the assistance, or at least the acquiescence, of officers and agents inside the Union. Therefore, Respondent Officers' and Agents' violations of the IBT Constitution merit punishment." (Ind.Admin.Dec. at 27). The Independent Administrator also found that respondent officers, as members of the executive board of IBT Local 507, were in a better position than respondent business agents to prevent Friedman from violating his suspension and his statutory bar. They had the authority to call meetings, pass board resolutions, and pursue other courses of action available to them in their capacity as IBT officers. (Ind.Ad-

min.Dec. at 27–28). In addition, the Independent Administrator found that certain business agents were more culpable than others. (See Ind.Admin.Dec. at 29–33). Accordingly, the Independent Administrator imposed penalties of varying severity in proportion to the degree of culpability of each respondent.

#### i. Officers Yontek, Walden, Jurevicius, and LaBuda

The Independent Administrator found that respondent officers Yontek, Walden, Jurevicius, and LaBuda failed to avail themselves of a variety of means they had at their disposal to enforce Friedman's one-year suspension and three-year statutory bar. The Independent Administrator observed that they had the authority to call meetings, pass board resolutions, and pursue other courses of action available to them in their capacity as IBT officers, but failed to pursue any appropriate course of action. Instead, they allowed Friedman to continue to influence the affairs of IBT Local 507, and gave the impression to IBT Local 507's membership that Friedman remained in charge of the local. (Ind.Admin.Dec. at 28). In addition to violating their duties as officers of IBT Local 507, the Independent Administrator found that they disrupted the performance of the Union's legal obligations by permitting Friedman to continue to influence the affairs of IBT Local 507 in violation of his statutory bar. (Ind.Admin.Dec. at 28–29).

For these violations, the Independent Administrator prohibited respondent officers Yontek, Walden, Jurevicius, and LaBuda from holding, or drawing any compensation from, any IBT-affiliated officer or trusteeship position for a period of eighteen months. The Independent Administrator permitted these respondents to retain their IBT membership during their suspension. (Ind.Admin.Dec. at 29). Respondents are barred from working, in any capacity, with IBT-affiliated entities during the period of their suspension. (Ind.Admin.Dec. at 29).

This penalty is neither arbitrary nor capricious. The Independent Administrator assessed the seriousness of an IBT officer's duties with regard to the enforcement of

suspensions and statutory debarments, and fixed a penalty that he adjudged to be appropriate. I find that respondent officers Yontek, Walden, Jurevicius, and LaBuda had greater opportunity to take action to resist Friedman's violations than did respondent business agents, and I find that their penalty is therefore fair and reasonable both in and of itself and in relation to the penalties imposed on respondent business agents. Accordingly, I affirm the penalty imposed on respondent officers Yontek, Walden, Jurevicius, and LaBuda.

### ii. Business Agents Kolar, Schuetz, Kapelka, and Lukic

The Independent Administrator found that although business agents Kolar, Schuetz, Kapelka, and Lukic were not in the same position of authority as IBT Local 507's executive board members, they nevertheless had a duty to do all that they reasonably could to enforce Friedman's one-year suspension and his three-year statutory bar. (Ind.Admin.Dec. at 29–30). Through their inaction, the Independent Administrator found, they permitted Friedman to continue to influence IBT Local 507 during his one-year suspension as well as after the commencement of his statutory bar, and failed to counter the impression given to the IBT Local 507 membership that Friedman was still in charge of the local. (Ind.Admin.Dec. at 29–30). In addition to violating their duties as business agents of IBT Local 507, the Independent Administrator found that these four respondents disrupted the performance of the Union's legal obligations by permitting Friedman to continue to exert influence over IBT Local 507 in violation of his statutory bar. (Ind.Admin.Dec. at 30).

For these violations, the Independent Administrator prohibited respondent business agents Kolar, Schuetz, Kapelka, and Lukic from holding, or drawing any compensation from, any IBT-affiliated officer or trusteeship position for a period of six months. The Independent Administrator permitted these business agents to retain their IBT membership during their suspension. (Ind.Admin.Dec. at 30). Respondents are barred from working, in any capacity, with IBT-

affiliated entities during the period of their suspension. (Ind.Admin.Dec. at 30).

Here again, the penalty imposed is neither arbitrary nor capricious. I find that while respondent business agents Kolar, Schuetz, Kapelka, and Lukic were less culpable than their fellow respondent officers and agents, they nevertheless breached their duty as IBT business agents in failing to take any action whatsoever to resist Friedman's violations, and I find that their penalty is therefore fair and reasonable both in and of itself and in relation to the penalties imposed on respondent officers and the remaining respondent business agents. Accordingly, I affirm the penalty imposed on respondent business agents Kolar, Schuetz, Kapelka, and Lukic.

### iii. Business Agents Thomas and Letner

The Independent Administrator found that respondent business agents Thomas and Letner became officers of IBT Local 507 in January 1991. (Ind.Admin.Dec. at 30–31). Friedman's one-year suspension extended from March 13, 1990 to March 13, 1991, and his three-year statutory bar commenced on January 3, 1991. Hence, the Independent Administrator found that while respondents Thomas and Letner did not have the same opportunity to prevent Friedman's activities as did respondent officers prior to January 1991, they did have at their disposal the variety of means available to executive board members to prevent Friedman's activities after they became officers in January 1991. (Ind.Admin.Dec. at 31). Thus, the Independent Administrator found that respondents Thomas and Letner were more culpable than business agents Kolar, Schuetz, Kapelka, and Lukic, and less culpable than officers Yontek, Walden, Jurevicius, and LaBuda.

Accordingly, the Independent Administrator prohibited respondents Thomas and Letner from holding, or drawing any compensation from, any IBT-affiliated officer or trusteeship position for a period of nine months. The Independent Administrator allowed Thomas and Letner to retain their IBT membership during their suspension. (Ind.Admin.Dec. at 31). Respondents are barred from working, in any capacity, with IBT-

affiliated entities during the period of their suspension. (Ind.Admin.Dec. at 31).

It was logical and proper for the Independent Administrator to impose on Thomas and Letner a penalty reflecting their relative culpability as compared to those respondents who were officers during all relevant periods. *See, e.g.,* June 10, 1993 Memorandum & Order, 824 F.Supp. 406, 408–10 (S.D.N.Y.1993). Thus, a nine-month suspension in the case of respondents Thomas and Letner is appropriate. Accordingly, I affirm the penalty imposed on respondent business agents Thomas and Letner.

#### iv. Business Agent Nativio

The Independent Administrator found that, as a business agent, respondent Nativio, like his fellow business agents, had a duty to do all that he reasonably could to enforce Friedman's one-year suspension and three-year statutory bar, and failed to fulfill that duty. In Nativio's case, however, the Independent Administrator found that a harsher penalty was warranted because of Nativio's more proactive role in assisting Friedman's violation of his one-year suspension. (Ind.Admin.Dec. at 32). The Independent Administrator noted that Nativio chaired the IBT Local 507 general membership meeting that Friedman attended, and made specific comments at that meeting intended to give the membership the impression that Friedman was still involved in the affairs of IBT Local 507. (Ind.Admin.Dec. at 32). In addition, Nativio also chaired the Riser Foods contract ratification meeting, at which Friedman encouraged the membership of IBT Local 507 to ratify the contract. (Ind.Admin.Dec. at 32).

Accordingly, the Independent Administrator prohibited respondent Nativio from holding, or drawing any compensation from, any IBT-affiliated officer or trusteeship position for a period of nine months. The Independent Administrator allowed Nativio to retain his IBT membership during his suspension. (Ind.Admin.Dec. at 31). Nativio is barred from working, in any capacity, with IBT-affiliated entities during the period of his suspension. (Ind.Admin.Dec. at 31).

The record clearly demonstrates Nativio's higher level of culpability in connection with the instant disciplinary offense. Hence, a proportionately more severe penalty is appropriate. Accordingly, I affirm the penalty imposed on respondent Nativio.

#### v. Penalties Imposed On All Respondent Officers and Agents

Contributions to respondents' employee benefit plans, regardless of whether or not such plans are under the exclusive control of the IBT, attributable to their positions as officers or agents of IBT Local 507, are to cease during the period of their suspension. Vested benefits in such plans are not, however, affected by the Independent Administrator's ruling, and respondents are free to use personal funds to continue any particular benefit. (Ind.Admin.Dec. at 33–35). In addition, the Independent Administrator ruled that respondents are not entitled to have any of their legal expenses paid by the IBT or any IBT-affiliated entity. (Ind.Admin.Dec. at 35). I find that the Independent Administrator's ruling with regard to respondent officers' and business agents' employee benefits and legal fees is appropriate in light of the record before this Court. Accordingly, I affirm in all respects the penalties imposed upon all respondent officers and agents.

### III. CONCLUSION

For the reasons stated above, Respondents' objections to the Independent Administrator's decision are overruled. The decision of the Independent Administrator is affirmed in its entirety. In addition, the stay of penalties imposed by the Independent Administrator is dissolved, effective immediately.

SO ORDERED.